Joel E. **TRUITT** et al., Appellants,

v.

J. Douglas **MILLER** et al., Appellees.

No. 13497.

District of Columbia Court of Appeals.

Argued March 5, 1979.

Decided Oct. 31, 1979.

Roger A. Morrison, Washington, D. C., with whom John P. Meade, Washington, D. C., was on the briefs, for appellants.

Leonard C. Collins, Washington, D. C., with whom Heidi D. Miller, was on the brief, for appellees.

Before NEWMAN, Chief Judge, and KELLY and HARRIS, Associate Judges.

KELLY, Associate Judge:

We review here a grant of summary judgment in favor of J. Douglas and Heidi Miller (the Millers) and against Joel Truitt

and Truitt & Associates, Inc.[1] Appellant, a home improvement contractor, contracted with appellees to do extensive remodeling of the latter's residence. Appellant did not have a license to do such work, as is required by 5Y DCRR § 2.1 (1970). After appellant completed a significant amount of remodeling, appellees repudiated the contract, citing the license violation, and sued in Superior Court for the return of the amounts already paid under the contract. Appellant counterclaimed for the value of the work performed for which no payment had been made. Appellant now argues that the adverse action by the trial court was in error because (1) the regulation, which applies only to home improvement contractors who accept payment in advance of the completion of the contract, does not apply to him; (2) he should have been allowed some contractual or quasi-contractual relief; and (3) should there be liability, that liability should attach to the principal, i. e., the corporation, and not the agent, Truitt.

Truitt & Associates, Inc., a District of Columbia corporation established in 1972, is engaged in the business of buying, restoring, and selling real estate in the District. In 1974, the emphasis of the business was placed primarily on the restoration, under contract, of homes. According to Truitt's affidavit,[2] he was at that time told by an employee of the District of Columbia Licensing Division that licensure as a home improvement contractor was not required for his type of operation.[3]

The Millers, then residents of suburban Maryland, purchased a house in Southeast Washington. Their desire was to renovate the house so that it would be an attractive residence and contain a basement apartment which could be leased out. They re-tained the services of Michael Bignell, an architect, to aid them in the design of the reconstruction work and to help them select a contractor to perform the work. Bignell knew and had done business with Truitt, and suggested that the Millers contract with Truitt and his corporation.[4]

Truitt, the Millers, and Bignell met on a number of occasions to discuss the terms of the contract. Numerous documents were drawn, yet as of May 30, 1976, no formal contract had been executed. In order to expedite renovation, Miller and Truitt signed a short, handwritten contract for demolition work not to exceed $1700 in cost.

The parties entered into two agreements, dated April 24, 1976, and May 7, 1976, for the restoration of the basement apartment and the remainder of the house, respectively. These agreements provided for a "cost-plus" method of payment whereby the Millers would pay Truitt the cost of work done plus a 10% finance administration fee and a 7% supervising fee. Rather than meet the cost of each element of the construction work as it accrued, Miller made periodic payments to Truitt. In essence, then, Truitt would make disbursements for Miller for which Miller would reimburse Truitt. Miller gave Truitt ten checks, of which three were deposited in Truitt's personal account and seven in an account in the name of Truitt & Associates, Inc.

Miller inspected the job site frequently at fairly regular intervals. Suggestions and alterations were made, and work progressed, albeit slightly behind schedule. On August 6, Miller wrote Truitt a check for $8,000; on August 7, Miller caused payment to be stopped on that check.

---

1. For the sake of clarity and ease, we will speak in terms of appellant Truitt. The opinion and its analysis apply, however, to both Truitt and his corporation.

2. Because this suit was concluded by summary judgment, some of the subsidiary facts are unsettled.

3. Upon the initiation of the present lawsuit, Truitt applied for a home improvement license. After some administrative delays, including a delay occasioned by this action, the application was approved and a license was issued on September 1, 1977.

4. Whether Bignell actually contemplated the corporation, as opposed to the individual Truitt, is an issue on appeal. By our review of the facts of this case, we do not mean to state as uncontradicted fact that Bignell did so contemplate the corporation.

Although the record does not indicate, beyond dispute, the reasons for the stop payment order,[5] we know that on August 7, Miller, by letter, informed Truitt that he was displeased with the quality and speed of Truitt's work. By subsequent letter, Miller expressed a willingness to arbitrate cost disputes for work already completed.[6] He also requested the subcontractor's time cards and payroll receipts and expressed a desire to deal with the subcontractors directly. Although Miller changed the locks on the house, Truitt and his employees continued to do some work, but they could only work when Miller was present.

Arbitration never occurred because Bignell, the arbitrator designated in the initial agreement declined to so act. All work by Truitt stopped on September 7, 1976. At that point, Truitt had performed, by his account, $57,400 worth of work, exclusive of fees, of which Miller had paid $40,785 to Truitt and $5,179 directly to the subcontractors.

In order to recover the remaining $11,400 in expenses, as well as $8,200 in fees, Truitt, on September 7, filed a mechanic's lien against the home.[7] On November 3, 1976, the Millers instituted the action that forms the basis of this appeal, requesting actual and punitive damages amounting to $350,000. On June 30, 1977, partial summary judgment was granted the Millers on their claim for a return of the amounts paid Truitt and dismissing Truitt's counterclaim. The Millers later dismissed their remaining damage claim and the partial summary judgment became final on February 22, 1978.[8] This appeal followed.

The issues presented are encompassed in three arguments. First, appellant contends that judgment based on Title 5Y was in error. Second, he argues that the remedy granted appellees was too severe. And, third, appellant maintains that should there be liability, that liability should attach to the corporate entity and not to himself. These issues are subsumed within the broader question of whether the court erred, as to each of its rulings, in granting summary judgment.

**I**

■ In ruling on a grant of summary judgment, we first view the evidence in a light most favorable to the party opposing the motion (the appellant). *Yasuna v. Miller*, D.C.App., 399 A.2d 68, 71 (1979); *Bennett v. Kiggins*, D.C.App., 377 A.2d 57, 59 (1977). If we find that that evidence gives rise to a genuine factual dispute, the grant of summary judgment would have to be reversed and a trial held on those issues. *Sullivan v. Heritage Foundation*, D.C.App., 399 A.2d 856, 859 (1979), citing Super.Ct. Civ.R. 56; 6 J. Moore, Federal Practice and Procedure ¶ 56.27[1]. In short, what we seek is evidence from which, were it accepted as true, a trier of fact might find for the appellant.

**II**

■ Appellant claims that the licensure regulation is not applicable to him. All parties agree that Title 5Y of the DCRR § 1.1 *et seq.* (1970), was designed to protect

5. Appellant maintains that the reason that appellees stopped payment on the August check was appellee's insolvency. He maintains that Miller left his salaried position on August 1, 1976. Moreover, he contends that pretrial discovery disclosed that the account on which the check was drawn held insufficient funds to cover the check. *See* note 8 *infra.* He points to a statement in Miller's August 7 letter to the effect that "it may be impossible to finish this remodeling with the funds remaining," and a similar statement in a Bignell memo of August 9 as evidence of appellees' insolvency.

6. In a letter of September 1, Miller wrote "we are not unwilling to pay for any valid services performed under this contract."

7. The lien was for $17,510. Thus we have three different estimates of the amount owing Truitt: $19,600 (computation noted above, taken from appellant's opening brief), $17,510 (lien), and $20,744 (appellant's counterclaim).

8. In the interim, appellant moved for an order compelling discovery so as to ascertain whether there existed sufficient funds to cover the $8,000 check. Appellee resisted the motion, and, although an order did issue, discovery was never completed.

consumers against unscrupulous dealings by home improvement contractors. *Bathroom Design Institute v. Parker*, D.C.App., 317 A.2d 526, 529 (1974). In *Miller v. Peoples Contractors, Ltd.*, D.C.App., 257 A.2d 476, 476–77 (1969), we outlined the effect and operation of Regulations:

> Section 2 of the Regulation *prohibits* "any payment" to an *unlicensed* contractor under a "home improvement contract in advance of the full completion of all of the work required to be performed by *such contract*". The Regulations define the term "home improvement contract as "an agreement for the performance of home improvement work for a contract price of $300 or more" . . . .. The Regulations define "home improvement work" as "the improvement, repair, restoration, alteration * * * of any residential property". . . .
>
> * * * * * *
>
> The Regulations require a contractor, in order to obtain a license, to prove trustworthiness to the licensing authority [Section 3(a) and (b)], deposit a security bond with such authority [Section 5(a)], obtain public liability and property damage insurance [Section 6], appoint the licensing authority as its agent for purposes of accepting service [Section 7], use appropriate identification cards in soliciting business [Section 11(a)] and reduce to writing on a *prescribed contract form* all agreements in their entirety entered into by and between a contractor and a homeowner [Section 13 and 14]. Penalties of up to $300 and imprisonment for as much as 90 days for violations thereof are provided. [Emphasis in original.]

A contract made in violation of the regulations is void. *Id.* at 478, citing *Brown v. Southall Realty Co.*, D.C.App., 237 A.2d 834, 837 (1968) (contract in violation of Housing Regulations is void).

 Appellant offers three reasons why the regulations should not apply to him. He argues, first, that the regulations

specifically exempt certain work performed by licensed individuals, citing Section 1.1 of the regulations which provides that

> The term "home improvement work" shall not extend to or include work performed by licensed electricians, licensed plumbers and gas fitters or licensed refrigeration and air conditioning mechanics so long as the work performed by them is limited to that of their licensed occupations.

Appellees do not maintain that this section is in any way inapplicable, nor do they deny appellant's assertion that work contemplated by the section was performed. We therefore must reverse the grant of summary judgment as to that work, and remand for a determination of the amount of such work. Section 1.1 simply provides that where a home improvement contractor contracts to renovate an entire house, as here, and subcontracts out certain responsibilities which have assurances of quality, the contractor should not be held liable for those operations should it be determined that the contractor was not duly licensed. Consequently, § 1.1 of the regulations does not exempt home improvement contractors such as appellant.

 Appellant's other reasons why the regulations do not apply to him telescope to a single concept: since the contract called for appellees to pay for the cost of renovation, presumably by subcontractors, plus a fee for the contractor, the regulations are inapplicable.[9] According to this argument, appellant served only as conduit for funds and thus should not be held liable under a regulation aimed at ensuring the quality of home improvement work. *See Schloss v. Davis*, 213 Md. 119, 131 A.2d 287 (1957).

The present case is unlike *Schloss v. Davis, supra*, however. There, the parties came to an explicit understanding that the contractor would merely arrange to have subcontractors do the work for the owner. The contractor was to be paid for this service on a strictly salaried basis.[10] In contra-

---

9. Appellant's other contentions are without merit.

10. *Schloss v. Davis, supra*, is also distinguishable on its facts. The illegality in question there was the failure to procure a permit for the construction of a particular house. Here, the omission pertained to any operation by the appellant.

distinction, the duties of the contractor in the present case could have involved performance of the actual work. Nothing in the proposed contracts and agreements would mandate that the contractor obtain outside workmen.

■ Appellant maintains that the regulation's proscription against the acceptance of advance payments does not apply to progress payments transmitted directly to subcontractors. His analysis is that progress payments are not advance payments, and that, at any rate, he was nothing more than an agent of appellees. The latter argument is the same as the one addressed above, and the former argument is incorrect. The regulation says "no person shall require or accept any payment under a home improvement contract in advance of the full completion of all the work required to be performed by such contract" absent licensure. 5Y DCRR § 2.1 (1970). Even if appellant did not receive each payment until *after* a particular portion of work was completed, he still received that payment *before* completion of the entire project.

### III

Appellant next argues that the relief granted appellees was too severe; *i. e.,* avoidance of the contract, judgment for the amounts already paid, and judgment against appellant for the value of services performed. In short, appellant performed, by his estimate, $60,000 worth of work for which he was paid $40,000. He has now been ordered to return the $40,000 and he cannot collect the additional $20,000.

■ The rule simply stated is that a contract made in violation of a licensing statute that is designed to protect the public will usually be considered void and unenforceable, and the party violating the statute cannot collect monies due on a quasi-contractual basis. *Bathroom Design Institute v. Parker, supra; Miller v. Peoples*

*Contractors, Ltd., supra; cf. Lloyd v. Johnson,* 45 App.D.C. 322 (1916) (licensing statute designed only to raise revenue, contract not void). *See also William J. Davis, Inc. v. Slade,* D.C.App., 271 A.2d 412 (1970). The case law is clear that the effect of a violation of the regulation here in question is avoidance of the contract. *E. g., Bathroom Design Institute v. Parker, supra.*

Appellant nevertheless argues that appellees should not be allowed to repudiate this contract because they are of equal fault, that is, in pari delicto. His point is that Miller wrote his last payment check knowing that he had insufficient funds to cover it [11] or any subsequent payment. He concludes that appellees now seek to use appellant's inadvertent failure to obtain a license to avoid a contract which they could not perform.

■ A party is in pari delicto in that concept's most conventional form if "by participating in the illegal transaction he is guilty of moral turpitude." *William J. Davis, Inc. v. Slade, supra* at 415. If a party is in pari delicto, he cannot ask the court to avoid the contract. We have held, however, and have repeatedly affirmed that "even though a party be considered technically in pari delicto he may be permitted to recover if the law in question was passed for his protection and it appears that the purposes of the law would be better effectuated by granting relief than by denying it." *Rubin v. Douglas,* D.C.Mun.App., 59 A.2d 690, 691 (1948), cited in *William J. Davis, Inc. v. Slade, supra* at 416. Since the regulation was passed for the class of consumers including appellees, that part of the *Rubin* standard is met.

Appellant urges a different concept of in pari delicto: that appellees' wrongdoing, other than participating in the contract, prevents recovery. That measure is closer to the equitable notion of "unclean hands."

■ Although "unclean hands" is a companion principle to the doctrine of in

---

11. *See* D.C.Code 1973, § 22–130(a) (false pretenses).

pari delicto, *Tarasi v. Pittsburgh National Bank*, 555 F.2d 1152, 1156–57 n.9 (3d Cir. 1977), it has no applicability in an action for damages. *Id.* Admittedly, the relief fashioned by the trial court was equitable in nature: rescission of the contract. However, appellees' complaint requested money damages, and since jurisdiction (equity versus law) is determined at the time of the filing of the complaint, *James v. Pennsylvania General Insurance Co.*, 121 U.S.App. D.C. 251, 349 F.2d 228 (1965), the legal defense was available whereas the equitable defense was not.[12] We therefore hold that appellant could not raise the defense of "unclean hands," and the defense of in pari delicto as accepted in this jurisdiction is of no benefit to appellant. The remedy is not, as a matter of law, too severe.

## IV

 Appellant's final contention is that, should liability be found, the liability is that of the corporation and not his personally. The trial court found Truitt and the corporation jointly and severally liable. Appellant would now have us restore the validity of his corporation's actions during the period of revocation in order to shield him from personal liability to the Millers. We agree that appellant's corporation should be held liable; but we also affirm the trial court's holding that appellant is also personally liable under the contract. Appellant, in allowing corporate reports to lapse, was personally responsible for the revocation of the corporate charter. He was also responsible for failing to inform the Millers that his business could not contract with them as a bona fide corporation. It is only just that he should be held personally to a contract

which he had no authority to make in a corporate capacity.

 With regard to the corporation's liability, appellees point out that the corporation did not exist during the time of contracting since its charter had been revoked. On this record, we know that the corporation lost its status sometime before the parties entered into the contracts. Application for reinstatement of the charter was made on either April 30, 1976, or April 15, 1976.[13] The reasons for this revocation appear to be failure to file annual reports for two consecutive years.[14] The corporation was reinstated on September 20, 1976.[15]

Appellees contend that the reinstatement of the corporation should have no retroactive effect, citing as binding precedent *Accurate Construction Co. v. Washington*, D.C. App., 378 A.2d 681 (1977). There, appellant construction company received from one Isabel Bates a promissory note secured by a deed of trust on the latter's home. When Bates died, the property passed by will to appellee Bernice Washington. The subsequent litigation was an attempt by Washington to rid the property of its encumbrance. This court held that since the construction company's certificate of incorporation had been revoked at the time the deed and note were executed, the documents were void. The company argued that to the extent that its charter was reinstated, that reinstatement should operate retroactively to validate the deed and note. The court disagreed, holding that reinstatement has no retroactive effect and stating in its opinion that during the period of revocation the corporation lacked the capacity to contract.

**12.** Appellant's characterization of appellees' cause as sounding in an action for the tort of conversion lends additional support for this argument.

**13.** The statement that the charter was revoked appeared in appellees' requests for admissions. Appellant did not deny the statement but noted that application for reinstatement was made on April 30, 1976. In his reply brief, appellant states that the application was made on April 15, 1976. Attached to the brief is a copy of an application for reinstatement. Such applica-

tion was not found in the record of the court below; however, the parties appear to agree to these facts.

**14.** Such reason is stated on the application for reinstatement that accompanied appellant's reply brief. *See* note 13 *supra.*

**15.** This information appeared in appellant's response to the request for admissions. *See* note 13 *supra.*

In *Accurate Construction Co.*, we held that reinstatement of a corporation could not restore the validity of a promissory note executed during the period of revocation. In that case, however, the *liability* of the corporation or its officers was not in question. There we denied the retroactive application of corporate reinstatement in order to close off the corporation's opportunity to *take advantage* of the invalid promissory note. We reasoned there that to apply reinstatement retroactively "would deprive the [revocation] statute [16] of its force and encourage a corporation to default on paying its taxes and fees and filing its annual reports if by subsequent compliance such a corporation could at its convenience completely erase the effects of the penalty." *Id.* at 685.

We recognized in *Accurate Construction Co.*, however, that

> [t]here may, of course, be cases where equitable considerations surface—as, for example, where it would be unreasonable to charge a corporation with responsibility for revocation of its charter, or where a corporation after revocation might be estopped to deny the validity of its undertakings when dealing with parties unaware of the corporate status. . . . [*Id.* at 685.]

We find that similar circumstances arise here. In this case, Truitt held itself out to the Millers as a bona fide corporation and it should now be estopped from using its own failure to file annual reports as a way to evade responsibility for the obligations it appeared to assume.

We did not intend by our ruling in *Accurate Construction Co.* to relieve corporations of obligations which they undertake, however illegally. "The purpose of revocation is obviously to prohibit a corporation from enjoying the privileges of that status when it has failed to perform its resultant responsibilities." *Id.* Therefore, we affirm the trial court's ruling that the reinstatement of Truitt's corporate charter applies retroactively to hold the corporation liable to the Millers. The trial court was correct in hold-

ing that both Truitt personally *and* the corporation are liable under the contract.

The grant of summary judgment as to liability for work performed by licensed electricians, plumbers, gas fitters, or refrigeration and air conditioning mechanics was improper and thus we remand for a determination of the extent of such work.

*Remanded for further proceedings consistent with this opinion.*