Clara Louise TURNER, et al., Appellants,

v.

DISTRICT OF COLUMBIA, et al., Appellees.

No. 85-634.

District of Columbia Court of Appeals.

Argued June 4, 1986.
Decided Oct. 28, 1987.

Joel M. Finkelstein, with whom Gary A. Stein, Washington, D.C., was on brief, for appellants.

Beverly J. Burke, Asst. Corp. Counsel, Washington, D.C., for appellees. John H. Suda, Acting Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, Lutz Alexander Prager, Asst. Corp. Counsel, and Richard B. Nettler, Asst. Corp. Counsel, Washington, D.C., at the time the brief was filed, were on brief, for appellees. Karen S. Dworkin, Asst. Corp. Counsel, also entered an appearance for appellees.

Before NEWMAN, TERRY, and STEADMAN, Associate Judges.

TERRY, Associate Judge:

This is an appeal from an order granting summary judgment for appellees, the District of Columbia and certain of its officials and agencies. The primary issue on appeal is whether the District of Columbia and its officials and agencies may be held liable for the death by starvation of an abused and neglected child and the malnutrition of another child which resulted, in part, from the alleged negligence of an agency of the District of Columbia government. In particular, we must determine whether there was a special relationship between the District of Columbia and appellants so that the District owed appellants more than the general duty of care it owes to the public at large. In the circumstances of this case, we hold that such a special relationship came into being, under a statute enacted in 1977, when a child abuse report was filed with the government agency established by that statute for the protection of abused children. We therefore reverse the trial court's grant of summary judgment for the District and remand the case for trial.

I

The facts of this case are largely undisputed.[1] In December 1982 Clara Turner

---

1. Our summary of the facts is based on the depositions, answers to interrogatories, and documentary evidence in the record. Because this is an appeal from a summary judgment, we

was living with Keith Lynn Roddy and their two sons, Keith and Lynn, along with three of Turner's older daughters, in an apartment on Benning Road, N.E. Keith, the youngest child, was four months old; Lynn was approaching his second birthday. Roddy had no job or income; Turner, however, received public assistance and paid the rent.

On December 10, after being sentenced to probation for a narcotics conviction in the Superior Court, Roddy returned to the apartment and began to argue with Turner. She ran outside to a nearby barber shop which was operated by their landlord, John Muse. Roddy ran after her and followed her into the barber shop. Grabbing her by the arm, he took her around the corner to an area behind an elementary school. There he knocked her to the ground and began to kick and beat her. Taking her back to the apartment, Roddy started to hit her again and continued to do so until the police were summoned, apparently by one of Turner's daughters.

When the police came, Turner left the apartment under their protection. According to her deposition testimony, she attempted to take the two youngest boys with her but was prevented from doing so by Roddy, who insisted that they stay with him. One of the police officers told her, "Miss, he's the father, we can't take those kids. He's the father, he has just as much right."

Turner and two of her daughters took a cab to a friend's house in another part of the city. About a week later, Turner sent her daughters back to the Benning Road apartment to check on the two boys, Keith and Lynn, and to take them something to eat. When the daughters returned to their mother, they reported that the apartment was filthy, that Keith's diapers had not been changed, that the toilet was stopped up, and that there was no food in the apartment.

must view the evidence in the light most favorable to appellants, the non-moving parties below. *See, e.g., Holland v. Hannan,* 456 A.2d 807, 815 (D.C.1983); *Truitt v. Miller,* 407 A.2d 1073, 1077 (D.C.1979).

On December 20 Roddy called Turner and asked her to come back, threatening to kill himself, the children, and her if she did not return. Apparently, Turner did not take his threats seriously, at least with respect to the children. Roddy did own a gun, however, and he had a history of assaultive behavior, having beaten Turner and the children on prior occasions.

One week later, on December 27, at approximately 11:05 p.m., Turner went with one of her daughters and a clergyman to the Child Protective Services (CPS) [2] intake branch at 1700 Rhode Island Avenue, N.E., to seek assistance for the two boys living with Roddy. There she spoke with Kitty Dawson, the social worker on duty. Turner reported that Roddy was not feeding the children or taking proper care of them, that there was no food in the apartment, that the children had rashes because their diapers were not being changed very often, if at all, and that Roddy would abuse the children "for any reason." She also told Dawson that Roddy was on probation for a heroin offense and that he was still using drugs, that he had no job or income, and that he faced possible eviction. Turner gave Dawson the name and telephone number of John Muse, the apartment manager, and said that he could be contacted for further information.

Kitty Dawson stated in her deposition that, in cases of alleged child abuse, she is required to send the complaint to the Youth Division of the Metropolitan Police. This case, however, she considered to be one of neglect, not abuse, so she did not notify the Youth Division. Instead, she referred Turner to Michael Cobb, an Assistant Corporation Counsel, so that he might arrange for her to obtain legal custody through a court proceeding. Dawson told Turner that although CPS could not return her children to her, the agency would "see if they are adequately taken care of and if they are all right."

2. Child Protective Services is a division of the Department of Human Services, an agency of the District of Columbia government.

The next morning, acting on Dawson's instructions, Turner met with Cobb at the Office of the Corporation Counsel. She told Cobb essentially the same things she had told Dawson. Additionally, Turner reported that Roddy was selling the household furniture in order to obtain drugs, and that Roddy had threatened to kill her and the children. On Turner's behalf, Cobb prepared a petition for a civil protection order,[3] with a supporting affidavit, and an application for temporary custody of the children.[4] He then arranged a meeting between Turner and representatives of the daytime unit of the CPS intake branch in order "to make sure we were all talking about the same thing." Cobb specifically recalled in his deposition that he telephoned Kitty Dawson "to make sure that the report and the information got through."

Meanwhile, the complaint that Turner had filed with Dawson the night before was routed to Dawson's supervisor, Virginia Scott, who signed a form at 6:20 p.m. on December 28 assigning the case to Elijah Mickel, a social worker on the CPS staff. Dawson testified in her deposition that she spoke with Mickel on or about the same day. Mickel, who had been with CPS for about two months, was responsible for investigating child abuse and neglect cases. On the night of December 28 he attempted to call Turner, but was unable to reach her. Turner eventually called him, but Mickel was not sure whether he took notes of her phone call.

Mickel read the intake report, which was captioned "Report of Alleged Child Neglect/Abuse," and spoke with Turner about Roddy's abusive behavior and the fact that he was on probation. Mickel could not remember whether Turner told him that Roddy was a drug user or whether he asked Turner about how Roddy mistreated the children. According to Turner, Mickel merely reviewed the contents of the report and told her, "If I find neglect, I will return your children. He said don't call me, I'll call you."

On December 29, sometime between 2:00 and 10:00 p.m., Mickel went to the apartment building on Benning Road where Roddy was living with the children. When he found the outer door of the building locked, he knocked on the door; receiving no response, he left. He never attempted to get a key from Turner, nor did he seek access to the apartment from anyone else, including the apartment manager whose name and telephone number were contained in the intake report. On January 5, 1983, Mickel went back to the apartment building and again found the outer door locked. As before, he left without making any effort to find someone who could let him in.

On January 11 Turner called Virginia Scott to report that Roddy "had been feeding their children water only." Scott said that she "would have Mr. Mickel check on the situation." On January 12 Mickel for the first time gained entry to the apartment building when Mr. Muse, the apartment manager, approached him on the street outside the building and let him in. He went to the Roddy apartment and knocked on the door, but no one answered. Although he heard loud music inside, he concluded that no one was home, so he left. He did not check with any neighbors to find out whether they knew anything about the children. Mickel said that he left a note under the door asking Roddy to call him, but Roddy never called.

Mickel did nothing further. He never contacted Turner again; nor did he make any effort to gain access to the apartment. He made no report to his supervisor or anyone else in CPS, nor did he ever seek the assistance of the police.

On January 26 Roddy called his probation officer, Mary Cross. He was "hysterical" and threatened to kill himself. Roddy told Cross that Keith had died and urged her "to go out and get the other child before he died." Cross described what she found when she arrived at the apartment:

The two-year-old [Lynn] was standing in the middle of the floor, very malnutritioned. His little ribs and everything

---

3. *See* D.C.Code § 16–1003 (1981 & 1987 Supp.).

4. *See* D.C.Code § 16–1005(c)(6) (1987 Supp.).

[were] sticking out, and his head was bigger than the rest of his body. He had defecated on himself. His pants ... were down around his knees, and he was reaching up for me to pick him up, and he was calling, Keith, Keith, Keith.... I just couldn't believe what I saw when I got in the room. The whole place was in shambles. The sink was stopped up. The water was backed up, and it was stinking.... I went into the bedroom, but I could smell that baby before. When I hit that door, I could smell it.

When the police arrived, they found Keith, the baby, dead of starvation and dehydration. The homicide report stated that Keith "had not been bathed for some time as is evidenced by the amount of 'caked' dirt that was present on the body." No underclothes of any kind were found in the apartment, and "[t]here was evidence that the decedent had been allowed to go in a soiled condition for some time." There was no food at all in the apartment; the refrigerator and cabinets were totally empty. "No articles associated with the care and feeding of a baby [were] found...." Roddy was arrested and charged with murder, but later he pleaded guilty to manslaughter and was sentenced to a term in prison.

Turner filed suit against the District of Columbia for negligent failure to fulfill its statutory obligations under the Prevention of Child Abuse and Neglect Act, D.C.Law No. 2–22, 24 D.C.Reg. 3341 (1977), *as amended*, D.C.Code §§ 6–2101 through 6–2127 (1981 & 1987 Supp.). Turner sued individually on her own behalf, as personal representative of the estate of her deceased son Keith, and as parent, guardian, and next of kin of her surviving son Lynn; Lynn was also named as a plaintiff. Cross-motions for summary judgment were later filed by both parties. The court granted the District's motion, and this appeal followed.

## II

Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c); *see Nader v. de Toledano*, 408 A.2d 31, 41 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). On appeal this court must view the record in the light most favorable to the party opposing the motion, and must resolve any doubt as to the existence of a factual dispute against the moving party. *Swann v. Waldman*, 465 A.2d 844, 846 (D.C.1983); *Murphy v. Army Distaff Foundation, Inc.*, 458 A.2d 61, 62 (D.C.1983). "In short, what we seek is evidence from which, were it accepted as true, a trier of fact might find for the appellant." *Truitt v. Miller, supra* note 1, 407 A.2d at 1077.

Because appellants' action against the District of Columbia is based on a theory of negligence, we must determine whether there is evidence upon which a reasonable juror could find for appellants on each of the elements of a negligence action. "The elements of a cause of action for negligence are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984) (citations omitted). Our inquiry in this case must focus on the duty allegedly owed by the District to Clara Turner and her two children. To obtain reversal, appellants must show that the District owed them a special duty of care beyond the general duty owed to the public at large. *See Morgan v. District of Columbia*, 468 A.2d 1306 (D.C.1983) (en banc); *Platt v. District of Columbia*, 467 A.2d 149 (D.C.1983); *Warren v. District of Columbia*, 444 A.2d 1 (D.C.1981) (en banc).

In *Platt v. District of Columbia, supra*, this court held that when the District of Columbia is sued for failure to provide public services, its duty of care is "owed ... to the public, and absent a special relationship, the District of Columbia cannot be held liable." 467 A.2d at 151

(citations omitted); *accord, Warren v. District of Columbia, supra,* 444 A.2d at 3. We further held that in order to convert a duty owed to the general public into a special duty, a plaintiff must prove two additional elements:

> (1) a direct contact or continuing contact between the victim and the governmental agency or official; and (2) a justifiable reliance on the part of the victim.

*Platt, supra,* 467 A.2d at 151 (citation omitted).

The victims in this case, of course, were two children, neither of whom had "direct contact or continuing contact" with CPS. Thus, on the facts of this case, the two-pronged test adopted in *Platt* cannot logically apply, because it assumes that the victims are or could be in a position to have contact with the government's agent and rely on the agent's representations. Obviously a six-month-old infant and a two-year-old toddler are not in a position to contact government authorities for help.[5]

Nevertheless, shortly after *Platt* was decided, this court recognized other circumstances in which a special duty can be shown to exist. In *Morgan v. District of Columbia, supra,* we noted that "a statute or regulation may describe a special duty to a particular class of individuals." 468 A.2d at 1314. To create such a duty, "the language of the statute or regulation must set forth 'mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole.'" *Id.* (citations omitted).

■ Reading *Platt* and *Morgan* together, we conclude that there are at least two ways to demonstrate the existence of a "special relationship"[6] between the city and the injured party which would justify reliance by the injured party on the city's representations. Such a relationship can be established either by "direct contact or continuing contact between the victim and the governmental agency or official,"

*Platt, supra,* 467 A.2d at 151, or by a statute that prescribes "'mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole.'" *Morgan, supra,* 468 A.2d at 1314 (citations omitted).

■ Appellants base their claim on the Prevention of Child Abuse and Neglect Act, *supra* (hereafter "the Child Abuse Prevention Act" or "the Act"), arguing that its enactment in 1977 created a special relationship between the Child Protective Services Division of the Department of Human Services and a narrowly defined class of persons: abused and neglected children. Appellants contend that when a report of child abuse or neglect is filed with CPS, specifically identifying an abused or neglected child, the Act requires that certain determinations be made and that certain actions be taken. Once the Act's provisions have been triggered, according to appellants, a special relationship exists between the District and the specifically identified child or children.

The Child Abuse Prevention Act, which establishes CPS as a distinct division within the Department of Human Services, states that the purposes and functions of CPS shall include:

> (1) Safeguarding the rights and protecting the welfare of children whose parents are unable to do so; ... [and]
>
> \*  \*  \*  \*  \*  \*
>
> (3) Ensuring that neglected and abused children are protected from further experiences and conditions detrimental to their healthy growth and development....

D.C.Code § 6–2121(a) (1981). The Act provides that CPS "shall be administered by a full-time Chief who shall be qualified by reason of training and experience to further the purposes of this act." D.C.Code § 6–2122(a) (1981). It further states that CPS "shall have sufficient staff, supervi-

---

5. It could be argued that appellant Turner was the "victim," or that her report that her children were being abused might be considered a vicarious "justifiable reliance" on the part of the children, in which case the two-part *Platt* test may indeed have been met. Given our disposition of this appeal on other grounds, however, we need not resolve either of these issues.

6. *Platt, supra,* 467 A.2d at 151.

sory personnel, and resources to accomplish the purposes of this act, including the capacity to provide emergency and continuing service resources to abused and neglected children and their families." D.C. Code § 6–2122(c) (1981). Another subsection provides:

There shall be within the Division a 24–hour intake component staffed by workers specifically trained in intake and crisis intervention. The unit shall be staffed at all times, 24 hours a day, 7 days a week. This component shall maintain the capacity for receiving reports and for responding promptly with investigation and emergency services. This component shall maintain a widely publicized telephone number for receiving reports at all times and shall maintain sufficient telephone lines and qualified staff so that all calls will be answered immediately by a trained worker.

D.C.Code § 6–2122(e) (1981).

The Act prescribes in detail the procedures to be followed by employees of CPS when a case of child abuse or neglect is reported. In particular, D.C.Code § 6–2102 (1981) provides in pertinent part:

(a) Upon the receipt of an oral report, the Division shall immediately inform the police of the contents of the report, if it alleges a child is or may have been an abused child.

(b) The Division shall commence an investigation of all reports alleging neglect other than abuse within 24 hours of the receipt of the report except that when:

(1) A report alleges that a child is left alone or with inadequate supervision, the Division shall commence an investigation immediately. If the Division is unable to dispatch a worker to the child forthwith, it shall inform the police of the report;

(2) A report indicates the existence of an immediate danger to a child and the immediate removal of the child from his or her surroundings appears necessary despite the available resources, the Division shall inform the police of the contents of the report and request the police to investigate. The

Division shall immediately commence a social investigation.

Finally, D.C.Code § 6–2104 (1981) outlines the investigative responsibilities of the police and CPS:

(a) The primary responsibility for the initial investigation is with the police in cases of an allegedly abused child and with the Division in other cases of an allegedly neglected child: Provided, however, that the investigation of a report involving acts or omissions of either the Department of Human Services or the police shall be conducted by the department which is not involved.

(b) The purpose of the initial investigation shall be to determine:

(1) The nature, extent, and cause of the abuse or neglect:

(2) The identity of the person responsible for the abuse or neglect;

(3) The name, age, sex, and condition of the abused or neglected child and all other children in the home;

(4) The conditions in the home at the time of the investigation;

(5) Whether there is any child in the home whose health, safety, or welfare is in jeopardy because of his or her treatment in the home or his or her home environment; and

(6) Whether any child who is in jeopardy because of treatment in the home or his or her home environment should be removed from the home or can be protected by the provision of resources such as those listed in § 6–2124.

## III

The Child Abuse Prevention Act imposes upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise helpless class of persons: abused and neglected children. When CPS employees are negligent in carrying out these responsibilities, that statutorily protected class suffers in a way uniquely different from the public at large. The question we must decide is whether, in these circumstances, a "special relationship" or "special duty" arises under the Act which would make the District

liable to members of that protected class for the negligence of CPS employees.

Although no case comparable to this one has previously come before this court, at least two state courts, when faced with similar facts, have held that a special duty was created by a statute in one case and by police regulations in the other, so that a tort action could be maintained against the government for the breach of that special duty. *Mammo v. State,* 138 Ariz. 528, 675 P.2d 1347 (Ariz.App.1983); *Florida First National Bank v. City of Jacksonville,* 310 So.2d 19 (Fla.App.1975).

In *Mammo* the father of a homicide victim brought a wrongful death action against the State of Arizona and its Department of Economic Security (DES) for failing to act promptly on his complaint that his children were being beaten by their mother, the custodial parent, and the mother's live-in boy friend. After a jury trial, a judgment for $300,000 was entered in the father's favor. The state appealed, arguing that it could not be held liable on the father's claim because "a breach of duty by the government owed to the public is not actionable unless the conduct involved gave rise to a special relationship which narrowed the public duty to a private duty owed to the plaintiff," and that the plaintiff had not proven such a private duty. 138 Ariz. at 531, 675 P.2d at 1350. The Arizona Court of Appeals disagreed. It held that "a duty arose on the part of DES to act with reasonable care when it received information from [the plaintiff] concerning the threatened child." *Id.* This duty, according to the court, was established by a state statute very similar to the District of Columbia Child Abuse Prevention Act. *See* Ariz.Rev.Stat.Ann. § 8–546.01 (1985 Supp.).

The evidence in *Mammo* showed that DES employees had failed to perform the duties imposed on them by the statute. After seeing bruises on his two older children during two weekend visits, Mr. Mammo, the father, learned from one of them that all three children had been beaten by the mother and her boy friend. The father took the two older children and reported his concern about the youngest child's welfare to the police, who relayed the information he gave them to DES. Mammo himself called DES the next day and spoke with an intake unit supervisor. DES, however, took no action except to recommend that Mammo retain an attorney to contest the mother's custody of all three children. Mammo followed this advice, but the youngest child remained with the mother while the custody suit was pending. Four days before the scheduled hearing on the custody petition, the youngest child died, the victim of a homicide at the hands of either the mother or her boy friend.

The court emphasized that the Arizona child protection statute "is quite specific and sets forth duties on the part of protection services workers which are clearly for the protection of threatened individuals." Once the child was "individually identified to the agency charged with her protection," the court held, "a relationship emerged between her and the state so that the failure on the part of DES employees to perform their duty worked a special injury to her." Consequently, "[b]ecause a duty arose on the part of [DES] to act for the protection of [the allegedly abused child], this matter was properly submitted to the jury." 138 Ariz. at 532, 675 P.2d at 1351 (citations omitted).

Similarly, in *Florida First National Bank v. City of Jacksonville, supra,* the court held that the plaintiff had sufficiently alleged in its two complaints that the police had a special duty to protect two children and keep them safe from abuse.[7] The complaints alleged that the children were being beaten and abused by their father while their mother was in jail on charges of knowingly uttering worthless checks. Several neighbors had made numerous reports to the Jacksonville police about beatings, but the police had failed to respond. The complaints stated that, under established police procedures, the police were required:

7. Both complaints were filed by the Florida First National Bank, which had been appointed guardian of the two minor children.

(a) to make a prompt and thorough investigation of all reports of child abuse and neglect, including:

>    (1) a physical examination of each child in the family;
>
>    (2) an interview with each child in the family;
>
>    (3) an interview with each parent;
>
>    (4) a complete check of the condition of the house;
>
>    (5) an interview with the person who made the report or complaint; and
>
>    (6) a review of the police and juvenile court records concerning prior complaints of child abuse;

(b) to make a report of each investigation of an alleged instance of child abuse or neglect ... pursuant to Florida Statutes § 828.041; and

(c) to take into immediate custody and bring before the juvenile court for protection, care and treatment of any child with marks or bruises indicating abuse or mistreatment, or whose environment was such that the welfare of the child required that the child be taken into custody.

310 So.2d at 22 n. 8. The complaints further alleged that after being repeatedly notified that the children were being abused, the police began an investigation but failed to conduct it in the required manner, and as a result the children were subjected to physical and emotional abuse, including multiple broken bones, multiple lacerations, contusions and burns, permanent impairment of hearing and vision, disfigurement, and brain damage.

The trial court granted the defendants' motion to dismiss on the ground that the city owed no special duty to the children. The Florida Court of Appeals reversed, holding that the allegations in the two complaints stated a cause of action:

> [T]he municipal employees undertook aid to the plaintiff's wards, other responsible citizens relied upon that undertaking, the municipal employees negligently performed (or failed to perform), and *those*

*specific children, as distinguished from the public in general,* were damaged. *Id.* at 27 (emphasis added).

The facts and circumstances of *Mammo* and *Florida First National Bank* are very similar to the facts and circumstances of this case. First, in each case the appropriate governmental agency was repeatedly notified of situations in which specific, named children were being mistreated. Second, the information received by the agencies in Arizona and Florida was no more or less reliable than that received here by CPS. In *Mammo,* as in this case, the initial report of abuse was filed by the noncustodial parent, while in *Florida First National Bank* the abuse was first reported by concerned neighbors. Third, in all three cases the child protection agencies were required by law to conduct a prompt investigation and to take certain actions, if necessary, for the protection of the individually identified children. Finally, the Arizona statute and the Florida police procedures are strikingly similar to the District of Columbia Child Abuse Prevention Act. In short, *Mammo* and *Florida First National Bank* provide powerful support for appellants' argument that a special duty was shown to exist in this case.

The District does not attempt to distinguish this case from *Mammo* and *Florida First National Bank,* but instead urges us to follow a contrary decision in which a federal district court, on similar facts, held that a special duty did not exist. *Nelson v. Freeman,* 537 F.Supp. 602 (W.D.Mo.1982), aff'd sub nom. *Nelson v. Missouri Division of Family Services,* 706 F.2d 276 (8th Cir.1983). In *Nelson* the complaint alleged that certain state officials had failed in their statutory duty to protect abused and mistreated children, and that as a result one child had died and three other children, the sister and two brothers of the decedent, had been the victims of repeated sexual abuse. Several concerned citizens had reported the ongoing abuse to the Division of Family Services by a telephone hotline established by state statute. The department investigated some of the calls, but allegedly failed to carry out or negligently performed its responsibilities under state law.

Eventually, as a result of one episode of abuse, an eight-year-old child died.

The trial court granted the defendants' motion for summary judgment, holding that "the Missouri Child Abuse statute created only a duty to the public and not to individuals...." *Nelson v. Freeman, supra*, 537 F.Supp. at 610. On appeal the Eighth Circuit affirmed, noting that although the appellants' argument was "not without some merit," the court was "guided by the principle that the interpretation of state law by a district judge sitting in that forum is entitled to substantial deference in the absence of controlling state precedent." *Nelson v. Missouri Division of Family Services, supra*, 706 F.2d at 277–278 (citations omitted).

Appellants maintain that *Nelson* is factually distinguishable from *Mammo* and *First Florida National Bank*, as well as from this case. In *Nelson* investigators for the Division of Family Services twice interviewed the mother of the children, who was alleged to be the primary abuser, and also interviewed the children themselves. Both the mother and the children denied any abuse. *Nelson v. Missouri Division of Family Services, supra*, 706 F.2d at 277. Even these investigative efforts were seriously flawed, in that the interviews were brief and the children were always interviewed in the presence of their mother. Nevertheless, as appellants note in their brief, "[h]ad the Child Protective Services employees in this case done as much as their Missouri counterparts, they would have in two interviews had the opportunity to evaluate in person the children's living conditions as required by the statute."

We agree with appellants that *Nelson* is distinguishable from this case and from the Arizona and Florida cases. We are also influenced by the rather narrow holding of the Eighth Circuit and by its less than ardent endorsement of the trial court's interpretation of state law. Moreover, we simply find *Nelson* less persuasive than *Mammo* and *Florida First National Bank*. For these reasons we decline to follow it.

Appellants cite another case in which a special relationship was found to exist. In *Florence v. Goldberg*, 44 N.Y.2d 189, 375 N.E.2d 763, 404 N.Y.S.2d 583 (1978), the mother of a child who was struck by a taxicab while returning from school sued the city on behalf of her son, alleging that the police department's failure to provide a substitute for an absent school crossing guard constituted negligence. The court, in holding for the plaintiff, initially stated the general rule: that "to sustain liability against a municipality, the duty breached must be more than a duty owing to the general public. There must exist a special relationship between the municipality and the plaintiff, resulting in the creation of 'a duty to use due care for the benefit of particular persons or classes of persons.'" *Id.* at 195, 375 N.E.2d at 766, 404 N.Y.S.2d at 586 (citations omitted); *accord, Morgan v. District of Columbia, supra*, 468 A.2d at 1312; *Platt v. District of Columbia, supra*, 467 A.2d at 151; *Warren v. District of Columbia, supra*, 444 A.2d at 4; *id.* at 9 (Kelly, J., concurring); *Mammo v. State, supra*, 138 Ariz. at 531, 675 P.2d at 1350; *Florida First National Bank v. City of Jacksonville, supra*, 310 So.2d at 21.

The court in *Florence* then concluded that a special relationship existed because

the police department voluntarily assumed a particular duty to supervise school crossings. Its departmental rules and regulations expressly provided that a crossing guard unable to report for duty advise the precinct sufficiently in advance to permit the police to make other arrangements to cover the crossing.... Where more urgent police duty necessitated a patrolman's presence elsewhere, he was required to notify the precinct and the school principal so that the latter could make arrangements to safeguard the children's welfare.

Significantly, the duty assumed by the police department was a limited one: a duty intended to benefit a special class of persons—viz., children crossing designated intersections while traveling to and from school at scheduled times. Thus, the duty assumed constituted more than

a general duty to provide police protection to the public at large. Having witnessed the regular performance of this special duty for a two-week period, the plaintiff infant's mother relied upon its continued performance.

44 N.Y.2d at 196–197, 375 N.E.2d at 767, 404 N.Y.S.2d at 587 (citations omitted). Accordingly, the court held that whether the police department negligently performed its duty to supervise the school crossing was "a question of fact properly left for determination by the jury." *Id.* at 197, 375 N.E.2d at 767, 404 N.Y.S.2d at 588.

In the three cases on which appellants primarily rely—*Mammo, Florida First National Bank,* and *Florence*—the courts all concluded that a special relationship existed between the government agency and the plaintiffs so that the state or municipality could be held liable for negligence.[8] These decisions are consistent with others throughout the country, holding that if a state agency is required by statute or regulation to take a particular action for the benefit of a particular class and fails to do so, or negligently does so, and the plaintiffs justifiably rely to their detriment on the agency's duty to act, a cause of action in negligence will lie against the state or its agency. *See, e.g., Adams v. State,* 555 P.2d 235, 241 (Alaska 1976) ("The duty is a limited one, and its beneficiaries a limited class ... not ... the public in general"); *Halvorson v. Dahl,* 89 Wash.2d 673, 676,

574 P.2d 1190, 1192 (1978) (en banc) ("Liability can be founded upon a municipal code if that code by its terms evidences a clear intent to identify and protect a particular and circumscribed class of persons" (citations omitted)); *cf. Oleszczuk v. State,* 124 Ariz. 373, 604 P.2d 637 (1979) (en banc) (whether duty is owed to the general public or to a specific individual is a material issue of fact precluding summary judgment).[9] In contrast, with the exception of *Nelson v. Freeman, supra,* the cases on which the District relies are all distinguishable from the case at bar, each of them being a typical public duty case: *Morgan v. District of Columbia, supra; Platt v. District of Columbia, supra; Warren v. District of Columbia, supra; Doe v. Hendricks,* 92 N.M. 499, 590 P.2d 647 (N.M.App.1979); *Yearwood v. Town of Brighton,* 101 A.D.2d 498, 475 N.Y.S.2d 958, *aff'd,* 64 N.Y.2d 667, 474 N.E.2d 612, 485 N.Y.S.2d 252 (1984).

In *Warren v. District of Columbia,* for example, a call came in to the police on the 911 emergency hotline reporting a burglary in progress. The police department employee who received the call assured the caller that assistance would be dispatched promptly. The dispatcher, however, delayed assigning the call and gave it an incorrect code, one lower in priority than "crime in progress" calls were supposed to receive. When police officers finally arrived at the scene of the burglary, they failed to make a thorough check of the

---

**8.** Appellants also refer us to *Brasel v. Children's Services Division,* 56 Or.App. 559, 642 P.2d 696 (1982). In *Brasel* the parents of an eighteen-month-old child who died of injuries suffered in a day care center which had been certified by a state agency filed a wrongful death action against that agency. The state argued that the plaintiffs had failed to plead a breach of duty, but the court disagreed. It held that the agency's "duty to plaintiffs as prospective users of a state-certified day care facility arises statutorily," citing a statute which vested the agency with "authority to establish health and safety standards for day care centers and to ensure compliance by inspection and investigation. By alleging that [the agency] issued a certificate to a center which did not meet these qualifications, and that plaintiffs subsequently entrusted their daughter to that center, plaintiffs have sufficiently alleged both a duty owed to them as

members of the protected class and a breach of that duty." *Id.* at 564, 642 P.2d at 699.

The *Brasel* decision is not really helpful here because it does not discuss whether there was a special relationship between the state and the plaintiffs of the sort that concerns us in this case. The court apparently assumed, without any discussion, that such a relationship had been established, or at least alleged in the complaint. Thus we need not consider whether the holding in *Brasel* is consistent or inconsistent with the law of the District of Columbia.

**9.** "When there is a statute involved, the more specific and narrow the duty required by the statute, the more likely it is that the duty has been narrowed from a general duty to the public to a specific duty to an individual." *Oleszczuk v. State, supra,* 124 Ariz. at 377, 604 P.2d at 641.

building and left without discovering the two burglars, who by this time had raped a four-year-old girl and forced her mother to commit sodomy. The victims' neighbors, two women who lived upstairs, made a second 911 call, again receiving assurance that help was on the way. No help ever arrived. For the next fourteen hours, the intruders held all the occupants of the building captive, including the two women who lived upstairs; they were all raped, robbed, beaten, and subjected to numerous sexual indignities.

Despite this shameful display of police ineptitude, the court held that neither the assurance of assistance nor the fact that the police had begun to act gave rise to a special relationship between the police and the victims. "[T]he desire for condemnation cannot satisfy the need for a special relationship out of which a duty to specific persons arises." *Warren, supra,* 444 A.2d at 4. Because the complaint did not allege a relationship "beyond that found in general police responses to crimes," this court affirmed the dismissal of the complaint for failure to state a claim. *Id.*

In *Morgan v. District of Columbia, supra,* the wife of a police officer was beaten by her husband, and a month later he threatened her with his service revolver. Mrs. Morgan told her husband's captain about these incidents and urged him to ask her husband to stay away from her. The captain suggested that she file a complaint. When she hesitated because she was afraid of what her husband might do, the captain agreed to talk to her husband when he reported for work. The captain did speak with Officer Morgan and told him to leave home if he could not get along with his wife. Three months later, after Mrs. Morgan had moved out of the house into an apartment, her husband found out where she was living and showed up at her front door. Threatening to kill her, he choked her into unconsciousness, drove her to her parents' home, took their two children, and left. Mrs. Morgan then called the police. When they arrived, Officer Morgan took out his service revolver and shot his wife and son, then turned and shot his father-in-law and a police lieutenant. Mrs. Morgan's father died of his wounds, but the other victims survived. Officer Morgan was later convicted of first-degree murder and assault with intent to kill while armed.

Mrs. Morgan and her son, mother, and brother sued the District of Columbia for negligence and wrongful death. A jury returned a verdict in their favor, but the trial judge set it aside and granted a judgment n.o.v. for the District. On appeal this court affirmed that judgment, holding that the District could not be held liable because "[t]he duty of the Metropolitan Police Department to protect the citizens of the District of Columbia from crime is a public duty, unenforceable by any one individual." *Morgan, supra,* 468 A.2d at 1316. "Absent a special relationship ... the police may not be held liable for failure to protect a particular individual from harm caused by criminal conduct." *Id.* at 1315; *see also Platt v. District of Columbia, supra* (city owes only a general public duty in case of allegedly negligent fire inspection); *Doe v. Hendricks, supra* (police); *Yearwood v. Town of Brighton, supra* (police).

In *Warren* and *Morgan* the only duty which the police owed to anyone was a public duty to the citizenry at large, as contrasted with a special duty owed to particular citizens. In this case, however, the duty is quite narrow and specific, created by statute to benefit a precisely defined class of persons: abused and neglected children who have been individually identified to the government agency charged with their protection. Moreover, the primary concern in the public duty cases is with the depletion of public resources that could result "if every oversight, omission or blunder made by a [public] official rendered a state or municipality potentially liable...." *Morgan, supra,* 468 A.2d at 1311. In the District of Columbia this concern has been eliminated with respect to abused and neglected children. The Child Abuse Prevention Act expressly requires CPS to "have sufficient staff, supervisory personnel, and resources to accomplish the purposes of this act...." D.C.Code § 6–2122(c) (1981). In this instance, therefore, the legislature has already provided that

sufficient public resources be allocated to meet the city's needs in protecting children from abuse and neglect.

## IV

In this case the evidence of record, viewed in the light most favorable to appellants,[10] would be sufficient to permit a reasonable jury to find that the District of Columbia was negligent in fulfilling the special duty it owed to these appellants. In her initial report to CPS, Clara Turner informed the intake social worker, Kitty Dawson, that her children were without food and clean diapers, that their father was on probation for a heroin offense, that he continued to use drugs, and that he abused the children without provocation. When an oral report alleges that a child "is or may have been" abused, CPS is required by statute "immediately [to] inform the police of the contents of the report." D.C. Code § 6–2102(a) (1981). Had Dawson done so, the police in turn would have been under a duty "immediately ... [to] commence an investigation of the circumstances alleged in the report." D.C.Code § 6–2103(c) (1981). Moreover, when a report alleges that a child is without adequate supervision, CPS is required either to "dispatch a worker to the child forthwith [or to] inform the police of the report...." D.C.Code § 6–2102(b)(1) (1981). The police, in turn, must "respond to the report immediately and ... take such steps as are necessary to safeguard the child until a [CPS] staff member arrives: Provided, however, that if [a CPS representative] does not arrive within a reasonable time, the police may transport the child to [CPS]." D.C.Code § 6–2103(e) (1981); see also D.C.Code § 16–2309(3) (1981) ("A child may be taken into custody ... by a law enforcement officer when he or she has reasonable grounds to believe that the child is in immediate danger from his or her surroundings and that the removal of the child ... is necessary"). If Kitty Dawson had labeled this case as one of abuse or inadequate supervision and reported it im-

mediately to the police, Keith might well be alive today.

In addition to its duty to inform the police, CPS was obliged under the Act to commence its own investigation immediately. D.C.Code § 6–2102(b)(1) (1981). The District argues, however, that Kitty Dawson exercised her discretion in labeling the case as one of neglect, rather than abuse or inadequate supervision, so that CPS did not have to begin an investigation for twenty-four hours. See D.C.Code § 6–2102(b) (1981). This did occur, says the District: Elijah Mickel was put on the case on December 28, the day after Turner's visit to the CPS intake office. Mickel testified in his deposition that he tried to telephone Turner that same evening, December 28, to verify the information on the intake form, but that he was unable to reach her.

Even assuming that CPS handled its responsibilities adequately that first day, however, Mickel was obligated by statute to gather certain data in his initial investigation. Specifically, he was required to determine:

(1) The nature, extent, and cause of the abuse or neglect;

(2) The identity of the person responsible for the abuse or neglect;

(3) The name, age, sex, and condition of the abused or neglected child and all other children in the home;

(4) The conditions in the home at the time of the investigation;

(5) Whether there [was] any child in the home whose health, safety, or welfare [was] in jeopardy because of his or her treatment in the home or his or her home environment; and

(6) Whether any child who [was] in jeopardy because of treatment in the home or his or her home environment should [have been] removed from the home or [could have been] protected by the provision of resources such as those listed in § 6–2124.

D.C.Code § 6–2104(b) (1981). In addition, Mickel and CPS were required not only to determine whether the children in the Rod-

---

**10.** *Truitt v. Miller, supra* note 1, 407 A.2d at     1077.

dy household should be removed from the home, but also to enlist the aid of the police in removing the children if CPS' resources were insufficient to protect them. D.C. Code § 6–2105(a) (1981).

Neither Mickel nor any other representative of CPS did any of these things. Mickel apparently tried to check on the children and to talk to Roddy on a few occasions, but he never did anything beyond leaving a note under Roddy's door asking him to call. In the thirty days in which Mickel was assigned to the case, he never saw the children. He never obtained or sought a key to the apartment building from either Turner or John Muse, the apartment manager whose name and telephone number were in Turner's report. On the one occasion when he fortuitously got inside the building, Mickel knocked on Roddy's door, only to leave on the assumption that nobody was home, even though loud music was coming from inside the apartment. Given Mickel's knowledge that two small children were allegedly living there with a drug addict father who had no job or income, nor apparently food or clean diapers, a jury could reasonably find that Mickel and CPS should have taken more affirmative action, as the Child Abuse Prevention Act required.

Thus we conclude that appellants presented enough evidence to raise a material issue of fact and thereby defeat the District's motion for summary judgment. Accordingly, we hold that the trial court erred in granting that motion.

V

We affirm the trial court's dismissal of the complaint with respect to Marion Barry, the Mayor of the District of Columbia, and Regina Barnard, the chief of CPS. The complaint alleged no facts suggesting personal involvement in this case by either of them, and as public officials they cannot be held liable in tort for the acts of their subordinates under a *respondeat superior* theory unless they directed or countenanced the tortious acts. *Eskridge v. Jackson,* 401 A.2d 986, 989 (D.C.1979). We also affirm the dismissal of the Department of Human Services as a defendant because it is not a suable entity. *Braxton v. National Capital Housing Authority,* 396 A.2d 215, 216–217 (D.C.1978); *Miller v. Spencer,* 330 A.2d 250, 251 n. 1 (D.C.1974).

With respect to the District of Columbia, however, we hold that when CPS received a report that the two Roddy children, who were specifically and individually identified, were being abused by their father, the Child Abuse Prevention Act created a special relationship between the District and the two children. From that moment on, the District had a duty to take certain steps prescribed by the Act for the protection of those children. The District's breach of that duty is actionable under the special duty exception to the general rule announced in the *Warren, Platt,* and *Morgan* cases.[11] The evidence of record is sufficient, if believed, to permit a reasonable jury to find such a breach. We therefore reverse the order granting summary judgment to the District and remand this case for trial.

*Affirmed in part, reversed in part, and remanded.*

STEADMAN, Associate Judge, concurring:

I concur in the result. I think that the particular facts of this case as alleged, with the two-part *Platt* test applied as indicated in footnote 5 of the majority opinion, and coupled with the wording of the statute at issue, precluded the granting of summary judgment. I go no further to dispose of this appeal.

---

11. We emphasize that this is an exceptional case, and that our holding is based on a statute, the Child Abuse Prevention Act, which imposes a special duty on a particular agency of the District of Columbia government to take certain action—set forth in detail in the statute—for the benefit of a specifically identifiable class. Were it not for that statute, we would, in all likelihood, be bound to affirm the trial court's judgment on the authority of *Warren, Platt,* and *Morgan.*