REMSEN PARTNERS,
LTD., Appellants,

v.

The STEPHEN A. GOLDBERG CO.
and Stephen A. Goldberg,
Appellees.

No. 99–SP–410.

District of Columbia Court of Appeals.

Argued Oct. 14, 1999.
Decided May 25, 2000.

George R. Clark, Washington, DC, with whom Pamela K. Riley, was on the brief, for appellants.

Paul A. Kaplan, with whom James W. Gladstone, Washington, DC, was on the brief, for appellees.

Before WAGNER, Chief Judge, RUIZ, Associate Judge, and BELSON, Senior Judge.

BELSON, Senior Judge.

This opinion deals with some of the consequences of performing real estate brokerage services without the license required by the District of Columbia Real Estate Licensure Act of 1982, D.C.Code §§ 45–1921, *et seq.* (the Brokerage Act).

The United States Court of Appeals for the District of Columbia Circuit has certified to this court the following question:[1]

> Where a party has performed brokerage services covered by the District of Columbia Brokerage Act's prohibition of use of the District's courts for recovery of compensation, D.C.Code § 45–1926(c), under what circumstances will the District of Columbia courts order the party performing the services to disgorge compensation already paid?

*Stephen A. Goldberg, Co., et al. v. Remsen Partners, Ltd.,* 335 U.S.App.D.C. 154, 160, 170 F.3d 191, 197 (1999). In introducing the question, the Circuit observed, "we do not see how [appellee] Goldberg can be entitled to recoup past payments by virtue of the Brokerage Act except under a view that recovery is completely automatic. Yet, as District law has allowed automatic recovery under comparable (albeit readily distinguished) statutes, we are uncertain what course the District will take." *Id.* We consolidated our consideration of the certified question with an appeal of a judgment of the Superior Court which was based in part on the conclusion that there was no entitlement to recover fees for brokerage services paid to an unlicensed corporation. *Marmac Inv. Co., Inc., et al. v. Robert N. Wolpe, et al.,* No. 97–CV–2016. The cases were argued jointly. Having considered the issues presented by both of the appeals, we *sua sponte* vacate the order of consolidation, and decide the cases separately.

We set forth below the details of our answer to the question posed by the Circuit. The sum of our holding is that recovery of real estate brokerage fees paid to an unlicensed person for completed services is not automatic.[2]

---

**1.** The question was certified pursuant to D.C.Code § 11–723 (1981). *See* D.C.App. R. 54.

**2.** Various terms are used to describe the relief at issue here—the return of money already paid—and we use them interchangeably. The term recover is defined as "to get or obtain

again, to collect, to get renewed possession of; to win back." BLACK'S LAW DICTIONARY 1147 (5th ed.1979). Disgorgement is an act or instance of disgorging, which is "to give up illicit or ill-gotten gains." WEBSTER'S THIRD NEW INT'L DICTIONARY 659 (1986). Restitution is "[a]n equitable remedy under which a person is restored to his or her original position

## I.

We will paraphrase the Circuit's concise statement of the facts. Pursuant to a 1992 Letter Agreement, the Stephen A. Goldberg Company ("the Goldberg Company" or "Goldberg") retained Remsen Partners, Ltd. ("Remsen"), a New York based financial consulting services corporation, to serve as financial advisor to the company. The goal was to arrange a $122 million "securitized" financing of various Maryland and Virginia apartment complexes managed by the Goldberg Company and owned by limited partnerships controlled by Stephen Goldberg. Securitized financing was described as a method of raising money by creating marketable securities from an income-producing asset. Here the parties used a mortgage loan as the asset, transferred the loan to a trust fund, and then sold ownership interests in the trust fund to investors. In consideration for Remsen's services, the Goldberg Company agreed to pay Remsen a closing fee amounting to one-percent of the principal amount of the financing, contingent on completion of the refinancing, as well as an annual consulting fee, which was to be paid in quarterly installments for the outstanding term of the investment. The financing was successfully completed in January of 1993. The Goldberg Company made the agreed post-closing payments until sometime in 1994, when it stopped making payments on most of the fees incurred after closing. However, it continued to make payment on the closing fees and on the first year consulting fees until January of 1997.

In November 1996 the Goldberg Company filed a complaint against Remsen in the Superior Court of the District of Columbia, seeking a declaratory judgment that the parties' agreement was void and unenforceable because Remsen was not licensed as a real estate broker, as required by the Brokerage Act. Goldberg also sought damages and rescission of the par-

ties' agreement for alleged fraud and misrepresentation. Remsen had the case removed to federal court based on diversity. It also filed a counterclaim against the Goldberg Company and a third party complaint against Stephen Goldberg, alleging breach of contract by both of them. The District Court granted summary judgment for the Goldberg Company, holding that the agreement was unenforceable and void because the Brokerage Act was applicable to the transaction. As the court found the Letter Agreement unenforceable, it deemed it unnecessary to reach the merits of Remsen's counterclaim. In addition, the District Court, basing its ruling entirely on the violation of the Brokerage Act, ordered Remsen to return all the money that was paid it by the Goldberg Company under the Letter Agreement ($1,078,045).

## II.

Remsen appealed the District Court's judgment to the United States Court of Appeals for the District of Columbia Circuit. That court affirmed the finding that the Letter Agreement was unenforceable because it was entered in violation of the Brokerage Act. *Goldberg, supra,* 335 U.S.App.D.C. at 156, 170 F.3d at 193. Before the Circuit, Remsen argued that the services it had provided Goldberg were not the services of a real estate broker under the Brokerage Act. The Circuit disagreed, pointing out that the statute includes among real estate brokers anyone who "negotiates a loan secured by a mortgage, deed of trust, or other encumbrance on real property ...." D.C.Code § 45–1926(b)(1)(B). It concluded that the Brokerage Act covered Remsen's activities. *Goldberg, supra,* 335 U.S.App.D.C. at 158, 170 F.3d at 195–96.

In doing so, the Circuit noted that Remsen was not in a position to maintain an action against Goldberg for the award of any fees to which it claimed entitlement

prior to loss or injury, or placed in the position he or she would have been, had the

breach not occurred." Black's Law Dictionary 1313 (6th ed.1990).

under the Letter Agreement. *Id.* The sections of the Brokerage Act then in force which barred such an action were D.C.Code § 45–1926(a) and (c). Subsection (a) stated: [3]

> It shall be unlawful for any person to engage in conduct, advertise, or hold himself or herself out as engaging in the business of a real estate broker ... unless that person holds a valid license as a real estate broker ....

Subsection (c) barred "any action in the courts of the District for the collection of compensation for their services performed in that [real estate] broker capacity." Thus, it is quite clear that under the Brokerage Act Remsen could not recover any unpaid portion of its fee by an action in the courts of the District of Columbia. *See RDP Dev. Corp. v. Schwartz,* 657 A.2d 301 (D.C.1995).

### III.

With respect to the issue of the remedy to which Goldberg was entitled, the Circuit found itself "most uncertain whether the District would allow recovery of fees already paid to Remsen, in the absence of evidence that Goldberg in any way failed to receive the services contracted for, or some other lack of equity." *Goldberg,* supra, U.S.App.D.C. at 159, 170 F.3d at 196. Therefore it certified to this court the specific question set out above, asking under what circumstances the courts of the District will order a party in Remsen's position to disgorge compensation already paid it by a party in Goldberg's position. To answer, we will first look to the principles of law and equity which are generally applied in other jurisdictions to resolve that issue. We will then look specifically at how the District of Columbia courts have treated this issue in instances of other unlicensed providers of services, identifying the principles that have governed such precedents. Finally, we will consider the Brokerage Act and how the controlling principles apply to actions brought under it.

### IV.

It is generally held that, in the absence of a statute that expressly calls for the recovery of such sums,[4] one who has paid money to an unlicensed person in consideration of the performance of a contract by that person is not entitled to recover back money paid on the ground that the service provider did not have a legally required license and therefore the contract was illegal. "When the services contracted for have been performed by an unlicensed person, courts nearly always have denied restitution of payments made for such services." 2 G. PALMER, THE LAW OF RESTITUTION § 8.3 (1978 & 1998 Supp.) (citations omitted). *See generally* Annotation, Recovery Back of Money Paid to Unlicensed Person Required By Law to Have Occupa-

---

3. The District of Columbia Real Estate Licensure Act of 1982, D.C.Code §§ 45–1921, *et. seq.,* which applies to this matter, was repealed on April 20, 1999. The real estate brokerage licensing laws are now codified in D.C.Code §§ 47–2801, *et seq.* D.C.Code § 45–1926(c), which prohibited an unlicensed broker from maintaining any action in the District of Columbia courts to recover unpaid compensation, was not carried over to the new licensing law. Remsen asserted during oral argument that the removal of § 45–1926(c) indicates a leniency toward unlicensed real estate brokers and suggests that unlicensed brokers may maintain actions in court. We do not pass on this issue because it is not before us. *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 178, § 181.

4. For example, the New York statute on licensing of real estate brokers provides: "In case the offender shall have received any sum of money as commission, compensation or profit by or in consequence of his violation of any provision of this article, he shall also be liable to a penalty of not less than the amount of the sum of money received by him as such commission, compensation or profit and not more than four times the sum so received by him, as may be determined by the court, which penalty may be sued for and recovered by any person aggrieved and for his use and benefit, in any court of competent jurisdiction." N.Y. REAL PROPERTY LAW § 442–e (3) (Consol.1999).

tional or Business License or Permit to Make Contract, 74 A.L.R.3d 637, 641 (1976); *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir.1982) (unlicensed securities broker's contract with real estate developer void, but broker may retain funds already paid); *Main v. Taggares*, 8 Wash. App. 6, 504 P.2d 309, 312 (1972) (neither statutes nor case law give one who sells his land through unlicensed broker right to sue for refund of commission once paid); *McShane v. Quillin*, 47 Idaho 542, 277 P. 554, 559 (1929) (where consideration has been paid and contract executed and benefit conferred in good faith, there is no sound principle to allow recovery of money paid to service provider). As the Circuit noted in certifying this matter, Judge Cardozo wrote as a member of the New York Court of Appeals:

> The law may at times refuse to aid a wrongdoer in getting that which good conscience permits him to receive; it will not for that reason aid another in taking away from him that which good conscience entitles him to retain.

*Schank v. Schuchman*, 212 N.Y. 352, 106 N.E. 127, 129 (1914).

However, "It is conceivable that a case could arise in which the public policy is so strong and the degree of violation so great that one benefitted by services rendered by an unlicensed contractor would be permitted to recover monies paid for the services . . . ." *Citaramanis v. Hallowell*, 328 Md. 142, 613 A.2d 964, 972 (1992). Exceptions are made where the law was passed for the benefit of the person seeking recovery and it appears that the purposes of the law will be better effectuated by granting relief than by denying it. *See* 74 A.L.R.3d at 656; *Ransburg v. Haase*, 224 Ill.App.3d 681, 684, 167 Ill.Dec. 23, 586 N.E.2d 1295 (1992); *Fosdick v. Investors' Syndicate*, 194 N.E. 58, 60 (N.Y.1934) (citing 3 WILLISTON ON CONTRACTS § 1789). Additionally, where the parties are not in pari delicto, recovery by the innocent party may be allowed. 74 A.L.R.3d at 660–61; *Comet*

*Theatre Enterprises, Inc. v. Cartwright*, 195 F.2d 80, 83 (9th Cir.1952) (stating rule); *see, e.g., Rubin v. Douglas*, 59 A.2d 690 (D.C.1948), discussed below. At least partial recovery is allowed where the service provider did not fully perform the agreement on his part. 74 A.L.R.3d at 656; *see, e.g., Unger v. Travel Arrangements, Inc.*, 25 A.D.2d 40, 266 N.Y.S.2d 715 (1966). Recovery is generally not allowed where there is no proof that the services rendered to the party were defective or that in any other way the party did not receive value for the money paid. *See, e.g., Comet, supra*, 195 F.2d at 83 (no recovery of sums paid to unlicensed contractor for services rendered where services were not defective and party for whom rendered has received value for which party paid). There is no equitable reason for ordering disgorgement where plaintiffs have received the benefits they expected.

█ It appears clear, then, that with respect to the remedy of disgorgement or recovery of monies paid under an illegal contract, such relief should not follow automatically from a finding of illegality except where an applicable statute or regulation calls for such relief or it is justified by strong public policy principles which are expressed or are implied by statute, regulation, or legislative history, or otherwise recognized. A trial court should arrive at its conclusion of what public policy requires only after a weighing of equitable considerations. "It is against public policy to support illegal activities, but also against public policy to permit unjust enrichment. In this clash, 'public policy' may represent a weighted balance of all the conflicting policies." DOBBS, LAW OF REMEDIES § 13.6 (1993).

## V.

As the Circuit's certification of the issue attests, this court has never decided whether recovery or disgorgement is required of an unlicensed party who has received payment for real estate broker-

age services rendered pursuant to a contract which is illegal because of the lack of a license. We have, however, dealt with that issue in cases involving health care providers and home improvement contractors.

*Rubin v. Douglas, supra,* involved a violation of this jurisdiction's Healing Arts Practice Act, which prohibited persons not licensed in accordance with the Act from engaging in the practice of "relieving, correcting, or curing or attempting to prevent, relieve, correct, or cure any disease." *Id.* at 691.[5] Plaintiff who suffered from arthritis sought medical attention from defendant, who agreed to provide her with treatment that would cure her condition. "The treatments, consisting of massaging and rubbing in of an ointment, were given, and plaintiff paid $160 on account." *Id.* at 690. Defendant was not licensed. In determining the appropriate remedy for plaintiff, this court's predecessor looked to the purpose of the Act. According to its legislative history, the Act was created to "fill the very great need for legislation to protect the people of the District from being preyed upon by ignorant, incompetent, untrained, conscienceless persons pretending to cure human ailments."[6] These words expressed a strong public policy to protect innocent persons from being taken advantage of by unlicensed practitioners of the healing arts. The Act was clearly intended to address the need to shield vulnerable citizens from the chicanery and deception of unlicensed practitioners. The court awarded plaintiff recovery of the money which she had paid to defendant.

In doing so, the court observed that it had long been the law that where an action is founded on an illegal contract, the courts will not interfere to relieve either of the parties from the results thereof. *Id.* at 691. It then stated:

However, if the parties are not in pari delicto, and one of them has not been guilty of serious moral turpitude, he may repudiate the contract and recover what he has paid under it. And even though a party be considered technically in pari delicto he may be permitted to recover if the law in question was passed for his protection and it appears that the purposes of the law will be better effectuated by granting relief than by denying it.

In the present case we do not consider plaintiff in pari delicto with defendant, but even if she were it is apparent that the law was passed for the protection of the public, including plaintiff, and that the purposes of the Act will not be effectuated by permitting defendant to retain that which he ought not to have received. The public interests, in our opinion, are best served by requiring defendant to pay back the fruits of his illegal agreement.

*Id.* (citations omitted).

*Rubin* is readily distinguished from the case before us because of the extraordinary strength of the public policy involved there, the trenchant description of that policy in the legislative history, the fact that the medical services the patient expected to receive were apparently not in fact satisfactorily rendered, and the conclusion that the Act would not serve the public interest as intended if it were construed to permit the medical practitioner to keep the payment he had received from his patient. *See* RESTATEMENT (SECOND) OF CONTRACTS § 181, cmt. c. ("In evaluating the gravity of the public policy involved, the court will look to the interest that the regulation is designed to protect and will give greater weight, for example, to a measure intended to protect the public health

---

**5.** The Healing Arts Practice Act, codified in D.C.Code §§ 2–1201, *et seq.,* was repealed in March 1986 in favor of the District of Columbia Health Occupations Revision Act of 1985, codified in D.C.Code §§ 2–3301.1, *et seq.*

**6.** Sen. Rep. No. 775, 70th Cong., 1st Sess. 1 (1928).

or safety than one intended to have only an economic effect.").

Perhaps the greatest number of cases in this jurisdiction dealing with the consequences of acting without a required license arise out of the District of Columbia Home Improvement Licensing Regulations.[7] Those cases differ from the case at bar in that the applicable regulations absolutely prohibit contractors from requiring or accepting "any payment for a home improvement contract in advance of full completion of all work required to be performed under the contract, unless that person is licensed as a home improvement contractor . . . ."[8]

This court has long adhered to the policy of requiring an unlicensed home improvement contractor to return to the homeowner payment it received for the job if the contractor received the payment in advance of completion of the job at a time when it was unlicensed. *See, e.g., Cevern, Inc. v. Ferbish,* 666 A.2d 17, 20 (D.C.1995); *Marzullo v. Molineaux,* 651 A.2d 808, 809–10 & n. 3 (D.C.1994); *Nixon v. Hansford,* 584 A.2d 597, 598 (D.C.1991); *Billes v. Bailey,* 555 A.2d 460, 462 (D.C.1989); *Woodruff v. McConkey,* 524 A.2d 722, 724 n. 1 (D.C.1987); *Erwin v. Craft,* 452 A.2d 971, 971–72 (D.C.1982) (per curiam); *Truitt v. Miller,* 407 A.2d 1073, 1078 (D.C. 1979); *Bathroom Design Inst. v. Parker,* 317 A.2d 526, 528 (D.C.1974); *Miller v. Peoples Contractors Ltd.,* 257 A.2d 476, 477–78 (D.C.1969).

In *Bathroom Design Inst. v. Parker, supra,* we explained the genesis of our strong policy. In discussing the Act's requirement for posting of a bond, we explained, "Congress provided this protection because of evidence before it of widespread victimization of District of Columbia homeowners by unscrupulous home improvement contractors." 317 A.2d at 529. We quoted our earlier statement that:

The [District of Columbia] Commissioners enacted the Regulations to prevent, among others things, those who do home improvement business without a license from exacting payment without performing since they have not provided satisfactory evidence of their reliability. Here, as in *Rubin v. Douglas, supra,* [t]he public interests . . . are best served by requiring defendant to pay back the fruits of his illegal agreement.

*Id.* at 528, *quoting Miller, supra,* 257 A.2d at 477–78.

We have adhered to that policy in the face of the argument that the "nullification of a contract effected by receipt of advance payments alone is harsh and disproportionate, resulting in a windfall to consumers who received good value for their money and then were allowed to keep the money anyway." *Cevern, supra,* 666 A.2d at 20. We gave two reasons for rejecting that argument; "first, because compliance with the licensing requirement by a qualified contractor is a simple administrative matter; and second, because anything but an unyielding rule would put temptation in the way of unqualified (and unscrupulous) contractors and invite recurrence of the same abuses that underlay enactment of the regulatory scheme." *Id.*

We have not required return of money paid to an unlicensed provider of services outside the home improvement and health areas, although in one case we endorsed such an approach in dicta. In *Saul v. Rowan Heating & Air Conditioning, Inc.,* 623 A.2d 619 (D.C.1993) we held that a corporation that rendered air conditioning services without the requisite license could not maintain an action for the value of its work. We reversed the judgment for the corporation and remanded the consumer's counterclaim for further proceedings. In a footnote, citing two home improvement cases and one case of fraud, we said that in such cases, the appropriate remedy normally is a return of money paid. *Id.* at

---

7.  16 DCMR 800 (1987).

8.  16 DCMR 800.1 (1987).

626 & n. 4. That statement in dicta did not fix a rule of universal application in this jurisdiction that recovery follows in all instances of a rescission based on the lack of a license.[9]

In an analogous situation, this court declined to impose the remedy of disgorgement upon merchants who had sold merchandise while not in compliance with 16 DCMR § 102.1 (1984), which provided: "Any person who is a retail seller or a sales finance company shall register with the Office of Consumer Protection ... as provided in this section." *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 202–05 (D.C.1991). Plaintiffs there had sought the return of all monies paid for merchandise during the period of noncompliance, while retaining the goods purchased. We stated that "We discern nothing in these regulations, or in the legislation which they were designed to implement, that would support the notion that such a remedy was intended to be available to a party who can demonstrate no injury whatever." *Id.* at 203. We observed that equity abhors forfeitures, and that the authority to impose a forfeiture should not be lightly inferred, but should be found to exist only if it is clearly articulated in the authorizing legislation or regulations. *Id.*

## VI.

Turning to services rendered by real estate brokers, we note first that the Brokerage Act is obviously regulatory in purpose and intended generally to protect the public from "incompetence, fraud, and deception in real estate transactions." *RDP Dev. Corp., supra,* 657 A.2d at 304. At the time Remsen rendered its services, the Act provided explicitly that an unlicensed broker could not bring an action in the courts of the District to recover for services. D.C.Code § 45–1926(c).

The Brokerage Act does not contain any language expressly providing that one who furnishes unlicensed real estate brokerage services must return any fee which has already been paid as of the time the contract is declared void. The Brokerage Act differs from the statutes and regulations that govern the provision of health services, home improvement contracting, and air conditioning work in that its provisions contemplate that the consumer may be in pari delicto. "No person shall knowingly pay a fee, commission, or compensation to anyone for the performance of any service or act within the District defined as the act of a real estate broker or real estate salesperson to any person who was not duly licensed at the time the service or act was performed." [10] Violation of this provision carries criminal penalties, D.C.Code § 47–2853.27.[11]

▉ Even if we should assume that the user of brokerage services in this case did not *knowingly* violate the law, the fact that the statute was designed to prevent such conduct and impose punishment if it occurred is itself significant. Obviously there may be instances in which the users of brokerage services are quite knowledgeable. In this case, for example, the users of the brokerage services are sophisticated business entities who had the advice of a nationally prominent law firm (Jones, Day, Reavis & Pogue), an accounting firm (Kenneth Leventhal & Company—now part of

9. Other District of Columbia precedents outside the home improvement and health areas have not dealt with disgorgement. *See, e.g., Highpoint Townhouses Inc. v. Rapp,* 423 A.2d 932, 935 (1980); *Holiday Homes, Inc. v. Briley,* 122 A.2d 229 (D.C.1956) (architect unable to recover for services for period during which he failed to renew his license); *Dunn v. Finlayson,* 104 A.2d 830, 831–32 (D.C.1954) (under pre–1950 legislation, neither regulatory in nature nor designed to protect public welfare, one who acted as architect without requisite license could recover for services).

10. When § 45–1940(c) was later repealed, the statute replacing it contained the same provision, § 47–2853.197(38) (1999).

11. The penalty provision was set forth in D.C.Code Section 45–1946(a) at the time of the transaction in question.

Ernst & Young), an investment banking firm (Donaldson, Lufkin and Jenrette), and a securities rating agency (Duff & Phelps). This is not to suggest that appellees (or their advisors) knowingly violated the Brokerage Act. As counsel for Goldberg acknowledged at oral argument, however, it may be correct that in this case neither party knew that this novel and complex securities transaction required a real estate broker's license.

It is fair to observe that in this particular case the sophistication of the consumers of the services and their advisors went a long way toward satisfying the public policy goal of protection against "incompetence, fraud and deception in real estate transactions." This circumstance itself calls into question the need in a case like this for resort to severe civil sanctions against the broker in addition to the statutory sanction of prohibiting an action for brokerage fees. We recognize that this court held in *RDP Dev. Corp. v. Schwartz, supra,* that the fact that the parties have sophisticated backgrounds does not exempt a transaction from the coverage of the Act, and went on to enforce the Act's explicit prohibition against an action for a fee brought by an unlicensed broker. *RDP Dev. Corp., supra,* 657 A.2d at 307. That is not to say, however, that when the courts look beyond an explicit statutory bar against actions for fees by unlicensed providers of services, and consider additional sanctions against them, they may not take into account, among other equitable considerations, the sophistication or the vulnerability of the user of the service.

## VII.

■ Having considered the general principles that the courts have applied to efforts to recover fees already paid to an unlicensed provider of services, the policies the courts of the District have applied where an unlicensed party has provided services in, primarily, the areas of health care and home improvement, and the differences between the statutory or regulatory frameworks that govern those areas as distinguished from the Brokerage Act, we conclude that disgorgement of compensation paid to an unlicensed real estate broker is not automatic. Rather, the circumstances of each particular case must determine whether disgorgement is required to vindicate the public policy underlying the statute.

As we indicated above, if the applicable statute or regulation mandates disgorgement, that ends the matter. In other cases the decision whether to order disgorgement must be made upon a careful weighing of the equitable considerations present, and in light of both the statutory policy to protect against incompetence, fraud and deception in real estate transactions, and the equitable policy disfavoring unjust enrichment. This court generally disfavors a remedy that entails unjust enrichment, and it should be employed only where, in light of all the circumstances, it is necessary to effectuate the purpose of the Act.[12]

■ Circumstances weighing in favor of disgorgement include significant injury to the user as a result of acts of the type the statute was intended to protect against, bad faith or knowing violation of the law by the unlicensed broker, the vulnerability or relative lack of sophistication of the user of the services, and whether the applicable statute expressly or by clear implication favors, but does not require, disgorgement.

■ Circumstances weighing against disgorgement are largely the converse of the foregoing. They include such considerations as whether disgorgement would unjustly enrich the user of the services,

---

12. Disgorgement where the user has paid for services adequately performed effects a forfeiture on the part of the provider of the services. *See Beard, supra,* 587 A.2d at 203 ("Equity abhors forfeitures."). *Cf. Berg v. Slaff,* 125 A.2d 844, 846 (D.C.1956) (the courts have always been reluctant to enforce forfeitures).

whether the sanction of disgorgement would be disproportionate to the violation, whether the unlicensed broker acted in good faith and can retain the payments in equity and good conscience, whether the user itself violated the law, especially if it was in *pari delicto*, whether the violation of law was merely technical or was not a knowing violation, and whether the user of services was knowledgeable and sophisticated.

Generally, the balancing of the equities in the light of relevant public policy is committed to the sound discretion of the trial court. In the case under consideration, however, as the Circuit observed, it is clear that only if disgorgement were automatic could it be appropriately ordered. Our discussion of the public policy and equitable considerations demonstrates that disgorgement is not appropriate here. This result does not in any way call into question or conflict with this court's holdings in the areas of health care and home improvement contracting which are based on different considerations of public policy.

In response to the certified question, we have set forth above the circumstances under which the courts of the District of Columbia will order a party performing real estate brokerage services without a license to disgorge compensation already paid. As we have explained, such relief is neither automatic nor warranted in the factual scenario present here.

The clerk shall certify this answer to the United States Court of Appeals for the District of Columbia Circuit.

*So ordered.*