*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-0690

THE C.A. HARRISON COMPANIES LLC, APPELLANT,

V.

KAREN EVANS AND CHARLES EVANS, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAR-3870-15)

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Argued December 1, 2020      Decided January 13, 2022)

*Vanessa Carpenter Lourie* for appellant.

*Victor E. Long* for appellees.

Before GLICKMAN, BECKWITH, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: Karen and Charles Evans hired the C.A. Harrison Companies, LLC (CAH) to manage the renovation of their home. CAH was supposed to oversee and supervise the project's general contractor, Capital Services Management, Inc. (CSMI). Unbeknownst to the Evanses, CSMI quit the job shortly after the renovation work began and CAH unilaterally and without consulting them

decided to fill the role of general contractor, a job it was not licensed to perform. Several months and several hundreds of thousands of dollars later, the Evanses discovered the unauthorized substitution, terminated their contract with CAH, and hired a new general contractor to complete the renovation.

CAH sued for breach of contract. The Evanses counterclaimed, arguing they had no enforceable contract with CAH because it was not licensed to perform as a general contractor, yet filled that role in violation of the District's home improvement regulations, 16 D.C.M.R. §§ 800, *et seq.* (2009). Because of that violation, the Evanses maintained that not only did they owe CAH nothing under their contract, but that they were entitled to a return of the funds they had already paid to CAH for its unlicensed work. The Superior Court agreed with the Evanses and ordered CAH to pay $314,394.35 in damages, an amount that included disgorgement of all funds the Evanses had paid to CAH after CSMI walked off the job. CAH now appeals, arguing that the home improvement regulations did not apply to it and, even if they did, the trial court erred in its calculation of damages.

We disagree with CAH's first argument. CAH assumed the role of general contractor and took on the responsibility of delivering the contracted-for renovations to the Evanses. It therefore had a "home improvement contract" with the Evanses,

and because it was not licensed as a home improvement contractor, its acceptance of progress payments "in advance of all work required to be performed" violated 16 D.C.M.R. § 800.1. We agree with CAH, to an extent, on its second point. There appear to be several errors in how the trial court calculated damages. We therefore affirm the trial court's judgment, save for its damages award, which we vacate and remand for reconsideration and recalculation.

## I.

In February 2014, the Evanses entered into two contracts for the purpose of completing renovation work on a home they purchased in the District. The first was a development management agreement with CAH, in which CAH agreed to oversee the renovation project, including supervising the general contractor and ensuring the renovation project was completed according to the Evanses' specifications. In exchange, the Evanses agreed to pay CAH $25,000 in management fees, paid in $5000 installments over the course of the project. The second was an agreement with a general contractor, CSMI, which agreed to perform the renovation work for $270,270.

To finance the project, the Evanses obtained a loan from Sandy Spring Bank. The construction portion of the loan totaled $295,270, which covered the cost of the

renovation work under CSMI's contract ($270,270) plus CAH's management fee ($25,000). The terms of the loan set a draw schedule, which permitted the release of funds in increments roughly commensurate with how much of the work had been completed. To receive funds through the draw schedule, the Evanses had to submit an itemized draw request supported by the relevant documents, including any invoices reflecting the construction expenses. An inspector from the bank could then visit the worksite to ensure the work had been completed as represented. If confirmed, the bank would wire the requested funds. From the outset, the Evanses entrusted CAH with preparing the draw requests, receiving any funds wired from the bank, and disbursing the funds accordingly.

Prior to the start of the renovation work, the Evanses purchased three cashier's checks totaling $35,777: one payable to CAH for $5000, one payable to CSMI for $27,027, and one payable to an architect for $3750. Not long after, in June 2014, the renovation work began with demolition on the Evanses' house. About a month later, CSMI stopped working on the renovation project. Instead of informing the Evanses of their general contractor's departure, CAH assumed CSMI's role and responsibilities. From that point forward, CAH managed the subcontractors formerly hired by CSMI and began directly hiring and supervising its own subcontractors to complete the renovation work. CAH never disclosed this new

arrangement to the Evanses, who for many months believed it was still CSMI performing as their general contractor.

During the time CAH was performing CSMI's role, it submitted five draw requests to Sandy Spring Bank, and it received a total of $172,197.46.[1]  A fraction of that ($15,000) was for CAH's management fee, while the remaining $157,197.46 was for the construction costs of the renovation project.  By the end of January 2015, a little over $87,000 remained on the loan to complete the renovation project, $5000 of which was earmarked for CAH's final management fee.  But the renovation project then hit a standstill when the Evanses discovered CSMI was no longer working on the project, prompting them to terminate their contract with CAH and hire a new general contractor to complete the renovation.

After its termination, CAH filed a Notice of Mechanic's Lien on the Evanses' property, claiming it was owed the final $5000 management fee as well as $23,378.10 in costs CAH allegedly expended on the renovation project but was

---

[1] The first draw occurred on August 20, 2014, totaling $31,177.54; the second draw occurred on September 17, 2014, totaling $29,457.64; the third draw occurred on September 26, 2014, totaling $54,002; the fourth draw occurred on December 9, 2014, totaling $48,148.02; and the fifth draw occurred on January 21, 2015, totaling $9,412.26.

never reimbursed for. CAH then filed a complaint in the Superior Court of the District of Columbia to enforce the lien. The Evanses counterclaimed, alleging CAH performed work as a home improvement contractor without a proper license in violation of the District's home improvement regulations, 16 D.C.M.R. §§ 800-899, so that whatever contractual relationship it had with CAH was null and void. The Evanses also counterclaimed for breach of contract and unlawful trade practices in violation of the D.C. Consumer Protection Procedures Act (CPPA), D.C. Code §§ 28-3901 to 3913 (2013 Repl.).

Following a six-day bench trial, the trial court ruled predominantly for the Evanses. It found that CAH performed work as an unlicensed contractor after its assumption of CSMI's responsibilities, rendering the contract between CAH and the Evanses null and void. The trial court refused to enforce the mechanic's lien and determined that clear and convincing evidence existed that CAH engaged in unlawful trade practices under the CPPA. As for damages, the trial court ordered CAH to disgorge all payments it had received during the course of the renovation project, which the court believed totaled $207,973.08, and awarded an additional $106,421.26 for costs incurred by the Evanses to complete the renovation project after CAH was terminated. The trial court did not specify a theory of damages under which those additional costs were awarded.

CAH now brings this appeal. It argues that (1) the home improvement regulations do not apply to it because it was not a home improvement contractor, and (2) even if they do apply, the trial court erred in its calculation of damages.[2]

**II.**

We begin with CAH's lead argument, that the District's home improvement regulations did not apply to it because it was not a home improvement contractor. The relevant regulation prohibits an unlicensed contractor from accepting payment "for a home improvement contract . . . in advance of the full completion of all work required to be performed under the contract." 16 D.C.M.R. § 800.1;[3] *see also* *Capital Constr. Co. v. Plaza West Coop. Ass'n*, 604 A.2d 428, 429-30 (D.C. 1992). A "[h]ome improvement contract" is "an agreement for the performance of home

---

[2] CAH also argues the trial court abused its discretion when it permitted the Evanses' expert, Deborah Anderson, to testify as an expert witness in accounting. But as the Evanses point out, Anderson's testimony "played no role in the trial court's decision," a point which CAH does not dispute. Any error in permitting Anderson to testify was thus harmless and we need not consider the issue further. *See* D.C. Code § 11-721(e) (2012 Repl.) ("[T]he District of Columbia Court of Appeals shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of parties.").

[3] Section 800.1 was originally enacted as 5Y D.C.R.R. § 2.1 (1970) and the modern regulation is identical in all material respects to its prior iteration. *See* *Thompson v. Wolfrey*, 483 A.2d 636, 636-37 & nn.1-2 (D.C. 1984).

improvement work for a contract price of three hundred dollars ($300) or more." 16 D.C.M.R. § 899.1 (2009). "Home improvement work" is, in turn, defined as "the addition to or alteration, conversion, improvement, modernization, remodeling, repair, or replacement of a residential property, or a structure adjacent to the residential property." *Id*.

A home improvement contract contravening this prohibition against unlicensed contractors accepting progress payments is "void and unenforceable, even on a quasi-contractual basis." *Capital Constr.*, 604 A.2d at 430 (internal citations omitted). Thus, "[i]f an unlicensed contractor accepts payment before completion of work under the contract, . . . the contractor is not entitled to contract damages and must return any payment received for work performed." *Carlson Constr. Co., Inc. v. Dupont West Condo., Inc.*, 932 A.2d 1132, 1135 (D.C. 2007).

Our court has heard the complaint that "the nullification of a contract effected by receipt of advance payments alone is [a] harsh and disproportionate" result, *Cevern, Inc. v. Furbish*, 666 A.2d 17, 20 (D.C. 1995), but we have consistently held that result is justified, citing two reasons. First, the regulation is not a blanket prohibition against contractors accepting progress payments, but requires only that a contractor be licensed before accepting such payments—"a simple administrative

matter" for the "qualified contractor." *Id.* Licensure provides "simple and sufficient proof" of the contractor's qualifications to perform the work of a general contractor. *Id.* at 21. Second, the purpose of the District's home improvement regulations is "to protect consumers against unscrupulous dealings by home improvement contractors." *Truitt v. Miller*, 407 A.2d 1073, 1077-78 (D.C. 1979). "[A]nything but an unyielding rule would put temptation in the way of unqualified (and unscrupulous) contractors and invite recurrence of the same abuses that underlay enactment of the regulatory scheme." *Cevern*, 666 A.2d at 20. For these reasons, "potential unfair applications of the rule at the margins have not persuaded us to sacrifice the benefits of a clear-cut, unmistakable requirement, with equally clear consequences for noncompliance, in this area of consumer protection." *Id.*

CAH argues that § 800.1 does not apply to it because it did not have a home improvement contract with the Evanses. It does not dispute the well-established proposition that a general contractor who oversees a home improvement project and is charged with "the actual 'delivery' of a finished project" is subject to this home improvement regulation. *Karr v. C. Dudley Brown & Assocs., Inc.*, 567 A.2d 1306, 1309 (D.C. 1989); *see also Truitt*, 407 A.2d at 1078-79.[4] Rather, CAH contends that

---

[4] CAH does, at times, make arguments that seem to contravene the proposition. For instance, in its reply brief it suggests that CAH was not a home

it was neither hired nor paid to serve as the general contractor overseeing the Evanses' project. In its view, it was a mere advisor on the project, similar to the consultant in *Karr* who we recognized fell outside of the regulation's proscription against progress payments. *See* 567 A.2d at 1309-10. But CAH's role in the renovation work went far beyond that of a mere consultant. CAH acted as the general contractor for the Evanses' home improvement project when it assumed the authority to hire and supervise subcontractors, and took on the responsibility for final delivery.

CAH simply does not resemble the consultant in *Karr*, which concerned an expert who was paid on an hourly basis to advise a general contractor on a home

---

improvement contractor because its owner, Christopher Harrison, was never personally "doing any work on the project physically." That is beside the point. Our precedents make clear that the home improvement regulations apply to general contractors. *See, e.g.*, *Karr*, 567 A.2d at 1308-09 (repeatedly stressing that consultant was "not a 'general contractor'" because he was not charged with "actual 'delivery' of a finished product."). General contractors typically are not the ones on the ground swinging the hammers, but instead insure, guarantee, and supervise the work of subcontractors. *See General Contractor*, Black's Law Dictionary (10th ed. 2014) (defining "General Contractor" as one "who contracts for the completion of an entire project, including . . . hiring and paying subcontractors, and coordinating all the work"); 16 D.C.M.R. § 899.1 (defining "home improvement contractor" as the one who "enters . . . into a home improvement contract with a homeowner").

improvement project.[5]  567 A.2d at 1307.  In *Karr*, the consultant had no "direct authority over the work of" the general contractor.  *Id.* at 1308-09.  It was the general contractor, not the consultant, who solicited bids from subcontractors, oversaw their work, and "assumed direct responsibility for completion of the renovation."  *Id.* at 1309.  Under those circumstances, we held that the consultant was not governed by the home improvement regulations and nothing prevented him from collecting his hourly wages prior to completion of the project.  *Id.* at 1309-10.

Here, CAH has far more in common with the general contractor in *Karr* than the consultant.  From the moment CSMI quit and stopped acting as the project's general contractor, it was CAH that stepped into the role.  It was CAH that contracted directly with subcontractors.  It was CAH that exercised supervisory authority over the work performed by the subcontractors.  Most importantly, it was CAH that took on the responsibility of delivering the final product and completing the project.  CAH was not merely advising the Evanses or some other general contractor interposed between the parties.  It was running the show.  CAH needed a license to perform that role, and because it lacked one, its acceptance of progress payments violated § 800.1.

---

[5] That project was for an older home and the general contractor "had no particular experience with older homes," so (at the general contractor's recommendation) the homeowners also hired a consultant to advise the general contractor on that aspect of the work.  *Karr*, 567 A.2d at 1307.

We decline to narrow our focus to the four corners of the development management agreement CAH had with the Evanses and will not ignore CAH's actual course of performance during the renovation project, as CAH suggests we should. Even if we were to take that approach, it appears the development management agreement is a home improvement contract on its terms.[6] In any event, our review is not so constrained. We have consistently used a more functional approach to determine whether an entity is covered by the home improvement regulations. In *Karr*, we noted the significance of the fact that the consulting contractor did not assume the role of the general contractor as the renovation project progressed, indicating that a party's course of performance is important to assessing whether it fits within the regulations. *Id.* at 1308. This approach also comports with our long-held recognition that the home improvement regulations must be interpreted to accomplish their "legislative purpose of protecting homeowners from fraudulent and unscrupulous practices in the home improvement industry." *Capital Constr.*, 604 A.2d at 430. Allowing CAH to evade licensing requirements despite its assumption

---

[6] The development management agreement, as written, provided that CAH agreed to "cause the Work . . . to be completed," "and to "supervise and inspect the progress of any Work at the Project until completion thereof . . . ." CAH's owner further testified that the "purpose of the [development management] agreement [was] to make sure or assist the homeowners in making sure the project [was] completed." Based on this language and testimony, the development management agreement seems to designate CAH's role as a home improvement contractor rather than as a mere consultant.

of the general contractor's role would provide a clear roadmap for other unscrupulous contractors to do likewise and would substantially undermine the regulations and licensing requirements.

CAH also argues, citing *Schloss v. Davis*, that the home improvement regulations are "not applicable where the contractor . . . only serve[s] as a conduit for the payment to subcontractors for a fee." 131 A.2d 287 (Md. 1957). But *Schloss* (1) is not binding on this court, (2) does not have persuasive force because it was interpreting a very different set of Maryland regulations, and (3) does not apply on its own terms to the facts of this case.[7] In *Schloss*, the court observed that Maryland's licensure requirements for general contractors were "for revenue and not for regulation," so that a failure to obtain a contractor's license should not render void a contract made absent the required license. *Id.* at 291. CAH asserts that we endorsed *Schloss*'s reasoning when we "favorably cited" it in *Truitt*, but that mischaracterizes the case. In *Truitt*, all we said was that *Schloss* was not applicable on its own terms. *Truitt*, 407 A.2d at 1078-79. Moreover, we have since rejected *Schloss*'s reasoning as incompatible with our own regulations. In *Cevern*, we

---

[7] When CAH assumed CSMI's role as general contractor, it became responsible not only for transmitting funds to subcontractors, but also for their hiring and supervision. Indeed, as discussed above, CAH "was actually responsible for completing the project." *Karr*, 567 A.2d at 1309.

explained, *contra Schloss*, that the District's requirement that a general contractor be licensed is not "designed solely to raise revenue," but instead serves the regulatory function of ensuring that general contractors are qualified to take on that role. 666 A.2d at 21.

Having determined that the home improvement regulations apply to CAH—and that the parties indeed had a "home improvement contract"—we can easily dispense with CAH's argument that it did not receive any payment for a home improvement contract. CAH does not dispute that it received close to $180,000 from Sandy Spring Bank during the course of, and prior to full completion of, the renovation project. Those payments were accepted by CAH (1) under a home improvement contract, and (2) before the work was fully completed. Therefore, because (3) CAH was not "licensed as a home improvement contractor," (4) CAH contravened 16 D.C.M.R. § 800.1. Accordingly, we find that the trial court was correct that the contract between CAH and the Evanses was void and unenforceable, and that the Evanses were entitled to a return of all funds they had already paid to CAH under that home improvement contract.[8]

---

[8] In light of our determination that the contract between CAH and the Evanses was void and unenforceable, CAH's argument that it was entitled to enforcement of its mechanic's lien is without merit. *See Cevern*, 666 A.2d at 18 (an unlicensed

## III.

CAH also challenges the trial court's calculation of damages. The awarded damages fall into two categories: (1) disgorgement of funds paid out during the course of the renovation project, and (2) compensation for additional contract-like costs the Evanses incurred to complete the renovation project following CAH's termination. CAH challenges both aspects of the awarded damages, claiming the disgorgement award was erroneously calculated and the additional damages were not permitted. We agree, to an extent, with each point.

## A.

CAH does not dispute that disgorgement is a proper remedy for contracts performed in violation of the home improvement regulations. Our "court has long adhered to the policy of requiring an unlicensed home improvement contractor to return to the homeowner payment it received for the job if the contractor received the payment in advance of completion of the job at a time when it was unlicensed." *Remsen Partners, Ltd. v. Stephen A. Goldberg Co.*, 755 A.2d 412, 418 (D.C. 2000)

---

contractor who violates the home improvement regulations "forfeit[s] the right to recover for work performed on either a contract or quantum meruit theory").

(collecting cases). CAH challenges only the trial court's calculation of the disgorgement award, alleging three distinct errors.

First, CAH argues the trial court ordered it to disgorge funds above and beyond the amount it received during the course of the renovation project. We agree. The trial court ordered CAH to disgorge $207,973.08 and return it to the Evanses. But that amount includes $30,777 worth of cashier's checks the Evanses paid directly to CSMI ($27,027) and an architect ($3750) prior to the start of the renovation project. Because those amounts were not paid to CAH they should have been deducted from the amount ordered to be disgorged. The record evidence shows that CAH itself received $177,197.46, comprised of $157,197.46 for construction costs and $20,000 for its management fee. That is $30,775.62 less than what the trial court awarded, with the difference attributable to the cashier's checks that should have been deducted.[9]

The Evanses do not dispute the factual point that the cashier's checks paid out to third-party vendors were reflected in the disgorgement award. The trial court

---

[9] There is a slight $1.38 discrepancy between the amount of the cashier's checks ($30,777) and the amount that should be deducted to reflect the amount actually received by CAH ($30,775.62). The source of that discrepancy is not clear.

believed otherwise—that the cashier's checks were funds expended above and beyond the $207,973 award. It was simply wrong about that. A summary of the $207,973 figure that the trial court relied upon in calculating its disgorgement award reflects a "Miscellaneous" cost totaling $30,777—the exact amount of the two cashier's checks. It is thus clear that the cashier's checks were part of the $207,973.08 figure, and the Evanses acknowledged as much at trial and further conceded it during the oral argument on appeal. The trial court clearly erred when it concluded otherwise, leading to its erroneous failure to limit its disgorgement award to the money actually paid to CAH.

Second, CAH argues the disgorgement award should not have included amounts CAH relayed to certain licensed subcontractors. This argument stems from the regulations' definition of "home improvement work," which exempts from its scope, "work performed by licensed electricians, plumbers and gasfitters, or refrigeration and air conditioning mechanics, so long as the work performed by them is limited to that of their licensed occupation." 16 D.C.M.R. § 899.1. According to CAH, because the above-listed work does not qualify as "home improvement work," any funds paid to subcontractors performing such work should have been subtracted from the trial court's disgorgement award. We appeared to endorse that approach to excluding payments relayed to licensed subcontractors from any disgorgement

award in *Truitt*, in which we opined "where a home improvement contractor contracts to renovate an entire house . . . and subcontracts out certain responsibilities which have assurances of quality, the contractor should not be held liable for those operations should it be determined that the contractor was not duly licensed." 407 A.2d at 1078. As an initial matter, it does not appear *Truitt* put the issue to rest. The point was conceded by the appellee in that case, *see id.*, and the court seemed to accept that concession without focusing "the judicial mind . . . upon the precise question," so that this statement might best be seen as dictum rather than binding precedent. *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) ("The rule of stare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question.").

Even if we assume it is binding precedent, however, it does not help CAH here because CAH did not substantiate what amounts, if any, it passed on to licensed subcontractors. CAH directs us to over 200 pages of bank records reflecting invoices and checks supposedly paid out for work performed on the renovation contract, as well as a ledger which summarily references expenses for "electrical" or "plumbing" work. But the cited materials say nothing about whether those subcontractors had the appropriate licenses at the relevant times. There was no evidence from which the trial court might have deducted amounts paid to licensed subcontractors because

CAH never gave a particularized or substantiated account of any amounts paid to licensed subcontractors. While CAH faults the trial court for "wholly fail[ing] to make a determination of the sums paid to licensed contractors," it was CAH that failed to provide the court with any factual basis for deducting such amounts from the damages that the Evanses established.

Third, CAH repackages its argument that it did not accept any payment for a home improvement contract. Rather, in its view, any funds it received were either payment for its management fee or were funneled to subcontractors or vendors for services and construction materials, and to the extent it performed any general contractor functions it did so gratis. This argument fails for reasons already articulated: following its assumption of CSMI's responsibilities, any payment CAH accepted was payment for a home improvement contract and was therefore properly disgorged. *See, e.g.*, *Bathroom Design Inst. v. Parker*, 317 A.2d 526, 528 (D.C. 1974) ("[T]hose who do home improvement business without a license . . . [and] exact[] payment without performing . . . [must] pay back the fruits of [the] illegal agreement.") (internal quotation omitted); *Marzullo v. Molineaux*, 651 A.2d 808, 810 n.3 (D.C. 1994) ("Any moneys paid may be recovered from the [unlicensed] contractor, and no quantum meruit may be awarded."). This includes any payments CAH accepted but did not ultimately retain for its own financial gain. *See generally*

*Truitt*, 407 A.2d 1073 (affirming trial court's disgorgement of funds paid for work completed by subcontractors); *Nixon v. Hansford*, 584 A.2d 597 (D.C. 1991) (affirming disgorgement of deposit used only to purchase materials rather than payment for skill or labor).

In sum, the trial court erred when it failed to deduct from its disgorgement award the money the Evanses paid directly to CSMI and the architect, and on remand we instruct it to adjust the award to reflect only the funds actually received by CAH.

**B.**

In addition to disgorgement, the trial court awarded $106,421.26 to the Evanses for costs they incurred to complete the renovation project after terminating CAH: $60,190.37 for CAH's refusal "to provide subcontractor information"; $4200 for debris clean-up; $5160 for granite that was provided and not returned; $7442.32 for tile; $2499.76 for bank costs resulting from a delay in the renovation project; $22,041.81 for rent payments; and $4887 for storage costs. The trial court did not articulate any theory for awarding these additional damages, and CAH contends there was no basis for them. The Evanses counter by floating two potential theories in defense of this additional award, arguing that it is justified either (1) under a breach of contract theory, or (2) for CAH's violations of the D.C. Consumer

Protection Procedures Act (CPPA), D.C. Code §§ 28-3901, *et seq.* Because it is not clear that these damages were appropriate under either theory, we remand for the trial court to vacate this additional award or, alternatively, to clarify the basis for it.

If this amount was awarded under a breach of contract theory, that would raise several potential difficulties. First, the trial court never found that CAH breached any contract; it in fact seemed to rule against the Evanses on their breach of contract counterclaim. The Evanses pled a breach of contract counterclaim in conjunction with a tortious interference claim, and the trial court ruled that the claim for "tortious interference with contract [and] breach of contract is denied." Second, it is not at all clear that the Evanses would be entitled to both recoup money they paid under a contract later determined to be void for CAH's lack of licensure, and then further collect on a theory that CAH breached the nullified contract. *Cf. Kent Homes, Inc. v. Frankel*, 128 A.2d 444, 445 (D.C. 1957) (when a contract is procured by fraud, "if a party chooses to rescind [the contract] he cannot also recover damages for the fraud," because those remedies are "mutually exclusive"). We recently declined to resolve that question in a similar context in *HVAC Specialist, Inc. v. Dominion Mech. Contractors, Inc.*, but suggested that recovery might be limited to a return of the

money paid to an unlicensed contractor, to the exclusion of damages for breach of contract.[10] 201 A.3d 1205, 1213-14 (D.C. 2019).

In certain circumstances, special damages above and beyond disgorgement may be awarded following the rescission of a contract, "in order that the parties might be placed in status quo ante." *See Kent Homes*, 128 A.2d at 446; *see also Family Constr. v. District of Columbia Dep't of Consumer & Reg. Affairs*, 484 A.2d 250, 255 (D.C. 1984) (return of money paid and restoration of property to status quo ante allowed where contract found void). But if that was the trial court's basis for these additional amounts, it needs to explain why (in its view) this additional $106,421.26 was necessary to restore the Evanses to their pre-contract position, because all indications are that this additional amount was an unjustified windfall. The disgorgement award alone seems to have placed the Evanses in a far better position than the status quo ante; they had a substantial portion of their renovation project completed by CAH free of charge.

---

[10] During oral argument, counsel for the Evanses suggested that, although the trial court determined the home improvement contract CAH assumed after CSMI's departure was null and void, it did not find the same for the development management agreement. That is wrong. The trial court explicitly ruled that the development management agreement itself was null and void.

The Evanses also suggest that the additional contract damages were permissible under the CPPA. The CPPA affords consumers affected by unlawful trade practices the ability to obtain or recover the following remedies:

> (A)   (i) Treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;
>
> (ii) Notwithstanding sub-subparagraph (i) of this subparagraph, for a violation of 28-3904(kk) a consumer may recover or obtain actual damages. Actual damages shall not include dignitary damages, including pain and suffering.
>
> (B) Reasonable attorney's fees;
>
> (C) Punitive damages;
>
> (D) An injunction against the use of the unlawful trade practice;
>
> (E) In representative actions, additional relief as may be necessary to restore to the consumer money or property, real or personal, which may have been acquired by means of the unlawful trade practice; or
>
> (F) Any other relief which the court determines proper.

D.C. Code § 28-3905(k)(2). Assuming the trial court awarded damages under the CPPA, it did not identify a particular provision justifying such an award. We have doubts the awarded relief here would fit under any of the above-enumerated types of relief under the CPPA, particularly where the trial court expressly declined to

award treble damages under the CPPA,[11] and there was no finding of "evil motive, actual malice, or [] willful disregard for the rights of the plaintiff" to suggest punitive damages were warranted. *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 725 (D.C. 2003).

Without a clear articulation of the trial court's basis for awarding the additional $106,421.26, we will not conclusively opine on the propriety of that award. Suffice it to say that we doubt that additional award can be justified based on any position the Evanses advance on appeal. We remand for the trial court to either subtract that amount from its damages award or articulate a basis under which it thinks it appropriate.

*       *       *

We affirm the trial court's judgment, save for its calculation of damages, which we vacate and remand for reconsideration consistent with this opinion.

*So ordered.*

---

[11] The Evanses did not file a cross-appeal challenging the trial court's refusal to grant treble damages, or the more nominal remedy of $1500 per CPPA violation.