*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-CV-0965

PATRICK WOODLEY, JR., APPELLANT,

V.

WOODBERRY VILLAGE APARTMENT, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CA-002357-B)

(Hon. Robert R. Rigsby, Trial Judge)

(Argued February 12, 2026                    Decided March 19, 2026)

*Fran Swanson*, with whom *Jonathan H. Levy* was on the brief, for appellant.

*Christopher J. Gowen*, for appellee.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: In this suit for damages based on a residential landlord's breach of the warranty of habitability over a span of years, the trial court found that the landlord was in breach but then substantially reduced the damages award because it sua sponte concluded that the tenant, by refusing to vacate the apartment for renovation at the landlord's urging, had failed to mitigate his damages.

This was error. As far as we can tell there was no evidence before the court that the landlord had followed the requisite process under D.C. Code § 42-3505.01(f)(1) to temporarily recover possession of a rental unit in order to renovate it and to guarantee the tenant's right to return. And, as we clarify with this opinion, the common law duty to mitigate, which generally requires the non-breaching party to take reasonable steps to reduce their damages, cannot be based on a tenant's failure to vacate an apartment with housing code violations absent a threshold showing of compliance with Section 42-3505.01(f)(1). Put another way, it cannot be unreasonable for a tenant to stand on their rights both (1) to live in a habitable apartment and (2) to remain in that apartment unless and until the landlord follows the process to temporarily relocate them for renovations and return them to their unit when renovations are complete. Accordingly, we reverse and remand for a recalculation of damages.

## I.    Facts

Proceeding without counsel in Superior Court, Patrick Woodley, Jr. sued the owner of the apartment complex where he had lived for twelve years, Woodberry Village Apartment (WVA). In his complaint, he alleged among other things that he had been discriminated against and that he had "no heat, mold, mice. It's just bad." He exclusively requested relief in the form of "monetary" damages.

Mr. Woodley subsequently moved for a temporary restraining order (TRO) and a preliminary injunction (PI). He alleged that WVA had turned off his electricity several days earlier in an attempt to "force [him] out of the ap[artment]." He asked the court to order WVA to turn his electricity back on; he also requested a "Section 8 voucher temporarily so I can move to a motel until this case is over."

The judge-in-chambers (J. Ann O'Regan Keary) held a hearing on Mr. Woodley's TRO/PI motion at which it heard from two witnesses, Alicia Brown, WVA's property manager, and Ferdinand Gamboa, a Supervisor for Housing Inspections for the Department of Consumer and Regulatory Affairs (DCRA).[1] Although it appears that no transcript was generated for this proceeding, the court issued a written order in which it ruled that Mr. Woodley had "failed to meet his burden of proving that he was entitled to the [relief] requested." In particular, regarding the first factor in the test for injunctive relief, the court concluded that Mr. Woodley "had not shown a substantial likelihood that he would succeed on the merits of his legal claim." The court relied on Ms. Brown's testimony that "reasonable accommodations have been made to relocate [him] to a suitable unit during the course of [WVA's] renovation, and, as an alternative, [WVA] offered [him] a one-

---

[1] At oral argument WVA suggested that it might have moved exhibits into evidence at that TRO/PI hearing, but the order made no mention of exhibits and the docket does not reflect any were admitted.

time payment of $5,000 to leave and find new housing elsewhere." The court further expressed doubt that Mr. Woodley had a "right to overstay in his current apartment as a 'hold-out,'" even though Mr. Woodley's right to possession was not the basis for his suit and WVA had not filed a counterclaim contesting Mr. Woodley's right to possession.[2] The court then observed that "[a]ny compensation for past harm suffered by living in an uninhabitable unit"—which along with his discrimination claim was the basis for his suit—"cannot be decided by this Court and must be reserved for the civil calendar judge to determine if damages are applicable and appropriate."

Mr. Woodley subsequently filed what he labeled a "pretrial statement" with the court in which he listed additional complaints about the conditions of his apartment, including "electric" and "ceiling." WVA filed a separate pretrial statement in which, for the first time, *see supra* at note 2, it asserted its defense to Mr. Woodley's suit. With the understanding that Mr. Woodley was alleging "Housing Code deficiencies" in addition to discrimination, WVA claimed that it had

---

[2] In fact, based on our review of the docket, it appears that WVA never filed an answer either to Mr. Woodley's initial complaint or his amended complaint (in which he increased his damages request). It is thus unclear why the court did not enter a default judgment for Mr. Woodley. *See* Super. Ct. Civ. R. 12(a)(5) ("Unless the time to respond to the complaint has been extended as provided in Rule 55(a)(3) or the court orders otherwise, failure to comply with the requirements of this rule will result in the entry of a default by the clerk or the court sua sponte.").

"set aside millions of dollars for renovations, and set a master plan for relocations, renovations, and tenant unit restorations," but that Mr. Woodley had "refused to move," "[d]espite his unit being condemned by inspectors from DCRA," and "[d]espite being offered multiple other suitable/accessible units."

Mr. Woodley's case against WVA eventually went to trial before a judge. Mr. Woodley testified, among other things, that his apartment was overrun by mice; for a month his electricity had been cut off; for at least a year, he had not had a functioning toilet and had had to use his bathtub to relieve himself (requiring him then to discard his own excrement in the bags he used for his dog); for two years he had not had a working refrigerator and had had a large hole in his ceiling; and for seven years he had lived without heat (requiring him to purchase multiple space heaters). He presented photographs of the mice, his bathtub, and the hole in his ceiling to the court. WVA did not cross-examine Mr. Woodley regarding the state of his apartment and presented no witnesses of its own. WVA did introduce fifteen exhibits—an incomplete set of which was given to this court in WVA's supplemental appendix—but none of these exhibits appear to have contradicted Mr. Woodley's testimony. Indeed, at least one, a letter from WVA's then-counsel, corroborated it, insofar as the letter informed Mr. Woodley that WVA was in the midst of a renovation project, the project would "commence . . . as scheduled" even if he "refused to relocate," and the "renovation process will necessarily involve interruptions in the

electrical, plumbing[,] and other building-wide systems (including the ones in your apartment)."

The court subsequently issued a written judgment in which it determined that Mr. Woodley had failed to prove that WVA had discriminated against him, but that he had proven that WVA had breached the implied warranty of habitability. The court noted that WVA had not "contest[ed] that [Mr. Woodley] was living in substandard housing" and found that "the record shows that this apartment is clearly un[in]habitable." The court also found, however, that WVA had "reasonabl[y]" offered to help Mr. Woodley move out, by providing him with a relocation unit and monetary assistance. The court concluded that because Mr. Woodley had failed to mitigate his damages as he had an "inher[en]t" duty to do, he was entitled only to $7,500 for the (unspecified) time period before WVA offered him relocation assistance.[3]

---

[3] The trial court also ordered Mr. Woodley to vacate the apartment within seven days—relief WVA had not requested and authority for which the court did not provide. The legality of this part of the court's judgment has not been challenged on appeal, however, presumably because Mr. Woodley did not comply with the court's order to move out, as evidenced by the records from WVA's suit for nonpayment of rent, which show that Mr. Woodley was ultimately evicted over a year later as a result of that action. *See Capitol Realty Grp. v. Patrick Woodley*, No. 2023-LTB-6464 (D.C. Super. Ct. Feb. 27, 2025); *see also Mejia-Cortez v. United States*, 256 A3d 210, 217 (D.C. 2021) (acknowledging this court's authority to take judicial notice of court records).

## II.    Analysis

Mr. Woodley, now represented by counsel, argues that the trial court was wrong to impose a duty to mitigate damages on Mr. Woodley; its $7,500 damages award is insufficient as a matter of law; and remand for a recalculation of damages is required.[4]  We conclude Mr. Woodley had no duty to mitigate his damages for WVA's breach of the warranty of habitability by vacating his apartment absent a threshold finding—which the trial court did not make and the record evidence before this court does not support—that WVA followed the statutory process for temporarily relocating Mr. Woodley in order to renovate his apartment.  And in the absence of any challenge to Mr. Woodley's argument that, if Mr. Woodley had no duty to mitigate damages, he is entitled to at least $22,788, we agree that the court's damages award was insufficient and remand for its recalculation.

### A. Duty to Mitigate

"The duty to the mitigate damages from a contractual breach" is a common law rule which "bars recovery for losses suffered by a non-breaching party that could have been avoided by reasonable effort and without risk of substantial loss or injury." *Sizer v. Lopez Velasquez*, 270 A.3d 299, 302 (D.C. 2022) (quoting *Bolton v. Crowley,*

---

[4] Mr. Woodley initially filed a pro se brief in which he alluded to different arguments, but we understand that brief to have been superseded by the "supplemental" brief filed by counsel.

*Hoge & Fein, P.C.*, 110 A.3d 575, 586 (D.C. 2015)). "The objective" of the duty to mitigate "is 'to put the injured party in as good a position as full performance of the contract would have' with 'the least necessary cost to the defendant.'" *Id.* at 302-03 (quoting 11 Corbin on Contracts § 57.11 (2021)). "The injured party is 'expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements.'" *Id*. at 303 (quoting Restatement (Second) of Contracts § 350 cmt. b).

"[T]he breaching party bears the burden of proving that the non-breaching party did not make reasonable efforts to mitigate damages." *Caesar v. Westchester Corp.*, 280 A.3d 176, 190 (D.C. 2022). Whether a party made a reasonable effort to mitigate damages is generally a question of fact which, when findings are made by a trial court, is reviewable only for clear error. *Sizer*, 270 A.3d at 303. That said, this court sets the outer bounds of what is "reasonable." *See, e.g.*, *Robinson v. Carney*, 632 A.2d 106, 108 (D.C. 1993) (endorsing the "general rule" that "injured parties need not . . . institute and prosecute [law] suits in order to mitigate damages" and reversing trial-court judgment concluding otherwise (alterations in original) (internal quotations omitted)); *cf. Howard Univ. v. Roberts-Williams*, 37 A.3d 896, 910-11 (D.C. 2012) (holding that trial court's jury instruction in employment suit that fired professor was required to reasonably minimize her losses but was not obligated to accept "lesser employment" was consistent with the application of the

duty to mitigate "in a specialized field such as education"). Here we consider whether a tenant who seeks to vindicate their rights under the warranty of habitability can be reasonably expected to move out of their apartment to mitigate damages if their landlord proves it offered relocation assistance but does not prove compliance with D.C.'s Rental Housing Act, specifically Section 42-3505.01(f)(1), the provision requiring housing providers seeking to renovate rental properties to follow certain procedures before they may temporarily relocate their tenants.[5] We review that question de novo, *see Sizer*, 270 A.3d at 303 (reviewing the legal question of what facts are permissibly considered in assessing the duty to mitigate), and conclude the duty to mitigate may not be imposed in this scenario.

We begin with the warranty of habitability, which imports the protections of the District's housing regulations into all residential leases and cannot be "waived or shifted by agreement." *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1082

---

[5] The District's Rental Housing Act also codifies a duty for a housing provider to mitigate damages when its tenant breaches their lease obligations. D.C. Code § 42-3505.52; *see also Sizer*, 270 A.3d at 303-04 (analyzing a landlord's duty to mitigate under the statute). Mr. Woodley took note of this statute in his brief to this court, but we understand his argument regarding the limits of a tenant's duty to mitigate to be grounded in common law principles of reasonableness, not in the plain text of Section 42-3505.52. We thus leave for another day what impact, if any, this statute has on a tenant's duty to mitigate damages when the landlord is in breach of its contractual obligations.

(D.C. Cir. 1970).[6] *Javins* abrogated an older common law rule absolving housing providers of the obligations to keep residential housing habitable and held instead that, "[s]ince a lease contract specifies a particular period of time during which the tenant has a right to use his apartment for shelter, he may legitimately expect that the apartment will be fit for habitation for the time period for which it is rented." *Id*. at 1079.

Next, we consider the procedures set forth in Section 42-3505.01(f)(1) for allowing a housing provider to require a tenant to temporarily move out of their units for renovations. The current version of these procedures dates back to 2006 when the Council of the District of Columbia enacted the Tenant Evictions Reform Amendment Act, D.C. Law 16-140. The Council was spurred by reports that housing providers were misusing Section 501(f) of the Rental Housing Act as "part of a strategy to empty the buildings of tenants to allow for their redevelopment into market-rate apartments." Report on Bill No. 16-556 before the Committee on Consumer and Regulatory Affairs, Council of the District of Columbia, at 2 (Feb. 10, 2006). The express purpose of the 2006 legislation was to give housing providers a procedure that allowed them to renovate rental properties if those renovations

---

[6] *Javins* is binding precedent on this court under *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971) (recognizing that decisions of the D.C. Circuit prior to February 1, 1971, constitute the case law of the District of Columbia).

could not be made while the properties were occupied, but also to protect tenants' right not to be relocated unless relocation were truly necessary, as well as their right to return to their unit after renovations are completed. *See* Tenant Evictions Reform Amendment Act of 2006, D.C. Law 16-140 at 1, 53 D.C. Reg. 3686 (June 22, 2006) (expressing the purpose to "ensure that no tenant is evicted under section 501(f) unless for the *bona fide* statutory purpose of making alterations or renovations to the rental unit which cannot safely be made while the rental unit is occupied, to ensure the absolute right of any tenant so evicted to reoccupy the rental unit, and, if the alterations or renovations are necessary to bring the rental unit into substantial compliance with the housing regulations, to ensure the right of any tenant so evicted to reoccupy the rental unit at the same rent").

Recognizing the inherent power imbalance between housing providers and tenants, *see Javins*, 428 F.2d at 1079 (highlighting "[t]he inequality in bargaining power between landlord and tenant," and specifically the fact that "[t]enants have very little leverage to enforce demands for better housing" whereas a shortage of affordable housing allows "landlords [to] place tenants in a take it or leave it situation"), the statute as amended interposes the Rent Administrator between the housing provider and the tenant and requires the housing provider to demonstrate that any renovations needed (including those needed to bring a tenant's unit into compliance with housing regulations) cannot occur while the tenant occupies the

unit, the tenant is afforded comparable housing to relocate to, and the tenant will be given the right to return.[7]  Specifically, housing providers are required, inter alia, to give the tenant notice of their renovation applications so that the tenant can weigh in on the housing provider's plans before the Rent Administrator.  *See* Section 42-3505.01(f)(1)(A)(ii).  Additionally, the Rent Administrator, before approving the plan, is required to make specific findings (with input from the Chief Tenant Advocate) that the renovation and relocation proposal is in the tenant's interests and that the work cannot be done with tenants in place.  *Id*. §§ 42-3505.01(f)(1)(A)(v), 42-3505.01(f)(1)(C).  Lastly, the housing provider must, prior to filing an action to recover possession of the unit, give the tenant a 120-day notice to vacate which must include a notice of the tenant's rights to reoccupy the unit (at the same rent if the renovations were to bring the unit into compliance with housing regulations) and to receive relocation assistance, *id*. § 42-3505.01(f)(1)(D), and must notify the tenant that their unit is ready to be reoccupied within five days of completion of renovations, *id*. § 42-3505.01(f)(1)(E).  An overview of the full process a housing provider must follow under Section 42-3505.01(f)(1) is set forth in this court's opinion in *Burkhardt v. D.C. Rental Hous. Comm'n*, 198 A.3d. 183,

---

[7] Some of these protections, such as the requirement of the Rent Administrator to approve renovation plans before tenants could be removed and the existence of a tenant's right to reoccupy their unit post-renovations, appeared in weaker form in the original D.C. Rental Housing Act, D.C. Law 6-10, § 501(f), 32 D.C. Reg. 3089 (July 17, 1985).

186-87 (D.C. 2018) (detailing inter alia the landlord's obligation to apply to and get approval from the Rent Administrator, the right of tenants to get notice of the application and to submit comment thereon, the power of the Office of the Tenant Advocate to investigate, the obligation of the housing provider upon approval of its plan to issue a 120-day notice to vacate prior to filing an action to recover possession, and the "absolute right" of tenants to reoccupy their apartments).[8]

Considering the implied warranty of habitability in conjunction with the process mandated under Section 42-3505.01(f)(1), we conclude that it would be unreasonable to impose on a residential tenant a duty to mitigate damages from conditions that violate the warranty of habitability by vacating the property absent a showing that the landlord complied with Section 42-3505.01(f)(1). Section 42-3505.01(f)(1) reflects the legislature's deliberate judgment that tenants have a protected interest in remaining in their homes unless and until a landlord demonstrates to a neutral party, the Rent Administrator, that any renovations needed (including those needed to bring tenants' units into compliance with housing regulations) cannot occur while a tenant occupies the unit, the tenants are afforded comparable housing to relocate to, and the tenants will be given the right to return.

---

[8] The only change to Section 42-3505.01(f)(1) since *Burkhardt* was an amendment in 2021 inserting "Department of Buildings" in place of "Department of Consumer and Regulatory Affairs." *See* D.C. Law 23-269, § 501(y)(6), 68 D.C. Reg. 1490 (Apr. 5, 2021).

Tenants are entitled to rely on this process and the interposition of the Rent Administrator between them and the housing provider. If tenants had to voluntarily vacate to fulfill a duty to mitigate damages from a breach of the warranty of habitability, their protection under the implied terms of their lease and Section 42-3505.01(f)(1) would be severely undercut. Housing providers would effectively be permitted to skirt the requirements of Section 42-3505.01(f)(1) by making individual side agreements with tenants to induce them to leave their apartments and to use their own failure to maintain habitable conditions as a mechanism to force the displacement that Section 42-3505.01(f)(1) was designed to prevent. *Cf. Scoggins v. Jude*, 419 A.2d 999, 1004-05 (D.C. 1980) (affirming the trial court's rejection of housing provider's assumption of risk defense where tenant sued for damages from a collapsed ceiling, explaining "[t]his court would undermine the public policy implicit in the Housing Regulations if we were to permit the argument that a tenant of substandard premises had the reasonable alternative of leaving the premises under lease"). Thus, we hold a housing provider must at least show compliance with Section 42-3505.01(f)(1) as a threshold matter before arguing

that a tenant failed to mitigate their damages from a breach of the warranty of habitability by remaining in the unit.[9]

## B. WVA's Failure to Make the Requisite Threshold Showing

Having held that a housing provider must show compliance with Section 42-3505.01(f)(1) before arguing that a tenant failed to mitigate their damages from a breach of the warranty of habitability by remaining in the unit, we look to see if WVA made such a showing here.  Not only did the trial court make no finding that WVA complied with the statute, but also there is no evidence in the record before this court that WVA did so.  Rather, it appears that WVA—in an attempt to avoid any liability at all for undisputed breaches of the warranty of habitability, not in support of a theory that Mr. Woodley had a duty to mitigate his damages from WVA's breach—presented a case that it had acted "reasonably" by attempting to negotiate with Mr. Woodley individually to persuade (or pressure) him to leave his apartment.

Recall that WVA put on no witnesses at trial and presented its case through exhibits, only some of which have been provided to this court.  Looking at these materials, we see no evidence of compliance with the statute.  Most notably, we see

---

[9] We do not decide with this opinion whether a tenant invariably has a duty to mitigate damages from a breach of the warranty of habitability whenever the housing provider complies with Section 42-3505.01(f)(1).

no evidence that WVA submitted a renovation and relocation plan to the Rent Administrator, or that the Rent Administrator approved such a plan, or that, based on the Rent Administrator's approval, WVA sought to require Mr. Woodley to temporarily vacate the property following statutorily approved procedures. Rather, WVA's position in the trial court appears to have been that Mr. Woodley should have left like all its other tenants had done and that WVA had tried to encourage him to go using carrots (e.g., an offer, discussed in the TRO/PI order, of $5,000 "to leave and find new housing elsewhere") and sticks (e.g., a warning that his utilities would be cut off), *see supra* Part I—not that WVA had followed the process that would authorize them to undertake their renovation project and to temporarily gain legal possession of Mr. Woodley's apartment solely for the duration of the project.

WVA argues, however, that Mr. Woodley had a duty to mitigate because "[t]he testimony from DCRA supervisor at the TRO[/PI] hearing confirmed that [WVA] was in compliance with all notices and efforts made with respect to the renovation of the building," and Mr. Woodley never argued that WVA had "failed to comply with D.C. statutes regarding their notices, plans, or applications with respect to their renovation efforts."[10] We are unpersuaded.

---

[10] WVA also vaguely argues that "neither of the administrative bodies that reviewed Mr. Woodley['s] allegations concluded that [WVA] was not in compliance with all requirements associated with the renovation." But WVA does not identify

First, appellate counsel for WVA acknowledged at oral argument both that he was not WVA's lawyer at trial and that he did not have a copy of/had not read the TRO/PI hearing transcript. He thus effectively conceded that he had no basis to make any statement about what the hearing *testimony* was.

Second, even if we look at the summary of the testimony from the DCRA Supervisor for Housing Inspections, Mr. Gamboa, in the Order denying Mr. Woodley a TRO/PI, which the trial court reviewed,[11] we see no support for the argument that WVA was "in compliance" with Section 42-3505.01(f)(1). According to the TRO/PI

these administrative bodies by name. To the extent it refers to proceedings before the D.C. Office of Human Rights and the United States Department of Housing and Urban Development—cases before those agencies having been referenced in a footnote by the trial court in its judgment—it fails to explain why either of those agencies would have the authority to opine about WVA's compliance with Section 42-3505.01(f)(1). And its statement that these agencies did not find that WVA was *not* in compliance is not the same thing as a determination that it was.

[11] The trial court's judgment contains no summary of the evidence received or stand-alone findings of fact, and it is unclear if WVA moved the TRO/PI order into evidence as an exhibit or whether the trial court reviewed it pursuant to Super. Ct. Civ. R. 65(a)(2) (providing that "evidence that is received on [a] motion [for a preliminary injunction] and that would be admissible at trial becomes part of the trial record and need not be repeated at trial"). In any event, the trial court cited to the TRO/PI order to support its finding that WVA had offered Mr. Woodley a "reasonable remedy" in the form of a relocation unit or monetary assistance triggering Mr. Woodley's duty to mitigate his damages. The trial court did not acknowledge the tension between the TRO/PI Order's determination that Mr. Woodley had failed to show that his claim was likely to succeed on the merits because WVA had offered him a "reasonable accommodation" on the one hand and the trial court's ruling that Mr. Woodley had proved that WVA was in breach of its obligations under the warranty of habitability on the other.

order, Mr. Gamboa testified that he somehow "learned" that Mr. Woodley had been given "proper notification" that his electricity would be cut off and "was refusing to leave despite the relocation accommodations." This testimony coupled with that of WVA's property manager that WVA was "completely renovating," other tenants had moved out "[t]o accommodate these renovations," and some sort of "notice" had been given to Mr. Woodley, provides some evidence that Mr. Woodley was aware that WVA wanted him to move and had advance notice of their renovation project and the effect it would have on him if he remained in his unit. But it sheds no light on whether review and approval had been given by the Rent Administrator for WVA's renovation and tenant-relocation plans or whether WVA had legal authority to seek to evict Mr. Woodley.[12]  *See* Section 42-3505.01(f)(1)(A-C). Further, Mr. Gamboa's testimony that he told Mr. Woodley that "he needed to leave the unit" does not constitute evidence of compliance with Section 42-3505.01(f)(1), given that the Housing Inspection Unit is within the Department of Buildings and is not affiliated with the Rent Administrator, who sits within the Department of Housing and

_____

[12] WVA highlights a tenant's obligation to give a housing provider access to the unit to assess and abate a housing code violation, *see* D.C. Code § 42-3505.51(b)(3). A tenant's obligation to give a housing provider such access does not encompass an obligation to vacate the apartment, however; instead, to gain temporary *possession* of a residential unit for repairs, the landlord must follow the process set forth in Section 42-3505.01(f)(1). Moreover, we see no evidence in the trial record provided to this court that Mr. Woodley ever denied WVA access to his unit; rather the evidence only establishes that he refused to vacate it.

Community Development.[13]  *See* D.C. Code §§ 10-561.07(a)(4)(B) & 42-3502.03. To be sure, as a part of the Rent Administrator's review of a housing provider's renovation and relocation plans, an inspector from the Department of Buildings must submit a report to the Rent Administrator and the Chief Tenant Advocate assessing "the accuracy of material statements in [a housing provider's] application."  *Id.* § 42-3505.01(f)(1)(A)(iii).  But Mr. Gamboa did not, at least according to the summary of his testimony in the TRO/PI order, say anything about submitting a report to the Rent Administrator.[14]

---

[13] WVA characterizes Mr. Gamboa's statement to Mr. Woodley that he "needed to leave" as a "directive" that Mr. Woodley "disobeyed."  WVA cites nothing for the proposition that Mr. Gamboa had the unilateral authority to order Mr. Woodley to vacate his apartment.

[14] WVA suggested for the first time at oral argument that if this court were not persuaded that it had shown that it had complied with Section 42-3505.01(f)(1) in the trial court, we should remand so that WVA could "clear the record up as to what the exhibits were" that it had presented to the trial court.  But in its briefs to this court WVA indicated that this court had all the materials we needed to resolve this case.  Even as it acknowledged "that the trial transcript does not provide much guidance as to what exhibits were admitted and for what purpose," it presented the issue on appeal as "[w]hether there is a basis for the appeal after an accurate record from the Trial Court is acknowledged." It specifically identified the TRO/PI order as the record document that compelled affirmance of the trial court's ruling.  And after asserting that the TRO/PI order was "incorporated into the trial order," it stated that "[t]he factual findings made by the Trial Court at the TRO[/PI] hearing completely contradict the factual basis for this appeal," and that "[a]ppellant's brief attempts to change the facts that were presented to the Trial Court as well as the case's record."

Third, WVA's suggestion that Mr. Woodley forfeited any argument that WVA had failed to comply with Section 42-3505.01(f)(1) ignores the fact that (1) WVA itself concededly never argued that Mr. Woodley had a duty to mitigate his damages—rather, the trial court raised this concept on its own for the first time in its written order—and (2) as explained above, "the breaching party bears the burden of proving that the non-breaching party did not make reasonable efforts to mitigate damages." *Caesar*, 280 A.3d at 190. Moreover, to the extent WVA argues that it said enough in the trial court to shift the burden of proof back to Mr. Woodley to disprove a failure to mitigate, we cannot agree. In light of our discussion above explaining why a tenant cannot have a duty to mitigate damages from a breach of the warranty of habitability absent a housing provider's compliance with Section 42-3505.01(f)(1), *see supra* Part II.A., it would make little sense to relieve a housing provider of its burden to prove statutory compliance and allow it to show only that it made "reasonable" efforts to negotiate with the tenant individually and persuade them to leave voluntarily.

Because we conclude that WVA failed to carry its burden to make the requisite threshold showing that it had complied with the processes set forth in Section 42-3505.01(f)(1), we reject the trial court's determination that WVA proved that Mr. Woodley failed to mitigate his damages from WVA's breach of the warranty of habitability.

### C.      Damages

In light of our determination that the trial court erred in concluding that Mr. Woodley had a duty to mitigate his damages, the trial court's damages award, which was reduced from an unspecified total to $7,500, cannot stand.  *See District of Columbia v. Org. for Env't Growth, Inc.*, 700 A.2d 185, 188 (D.C. 1997) (reversing damages award based on "faulty legal analysis"); *Frenkel v. D.C. Rental Accommodations Comm'n*, 432 A.2d 1226, 1228 (D.C. 1981) (remanding for a recalculation of damages where the Commission computed damages "contrary to law"); *see also Hto7, LLC v. Elevate, LLC*, 319 A.3d 368, 382 (D.C. 2024) ("A calculation of damages must rest on an adequate basis for a reasoned judgment." (internal quotations omitted)).

Before this court, Mr. Woodley offers a calculation of his damages.  Relying on the trial court's finding that his apartment was "clearly un[in]habitable," Mr. Woodley asserts that its rental value was zero and argues that he was entitled to the difference between his monthly rent ($844) and the rental value of his apartment for the duration of WVA's various breaches of the warranty of habitability.  He thus calculates that he is entitled to a 100% rent reduction for (1) the two-year period when his apartment was overrun with mice and had no working refrigerator or toilet and a collapsed ceiling (24 months x $844 = $20,256) and (2) at least December through February in the preceding year, when the apartment was necessarily

unlivable due to lack of heat (3 months x $844 = $2,532). On top of this minimum total of $22,788, he argues that he is also entitled to damages for the lack of heat in the four other heat-mandatory months (October, November, March, and April); he asserts this third category of damages must be "measured by how much the value of the unit was diminished for Mr. Woodley, which could be up to 100%" (and therefore could amount to an additional $3,376).

WVA does not contest these calculations, arguing only that Mr. Woodley should not receive more than the $7,500 the trial court awarded because (1) he had a duty to mitigate his damages from WVA's breach of the warranty of habitability, (2) he "came before this court of equity with unclean hands because he violated D.C. law, his lease, and general principles of equity by preventing [WVA] from repairing his unit," and (3) WVA won a separate money judgment against Mr. Woodley in a subsequent lawsuit, apparently alluding to WVA's suit for nonpayment of rent, *see supra* at note 3. We have addressed the first argument above. To the extent the second is not a repeat of the first, it is unsupported by the record before this court. Specifically, we see no evidence that Mr. Woodley "violated D.C. law, his lease, [or] general principles of equity by preventing [WVA] from repairing his unit." *See supra* at note 12. (We also note that a claim for the breach of warranty of habitability is not a claim in equity but a contract claim, *see Bernstein v. Fernandez*, 649 A.2d 1064, 1073 (D.C. 1991), and the doctrine of unclean hands does not apply where, as

Mr. Woodley did here, a plaintiff sues for damages, *Truitt v. Miller*, 407 A.2d 1073, 1080 (D.C. 1979)). As for WVA's third argument, even if WVA subsequently won a judgment against Mr. Woodley (which Mr. Woodley disputes) in a separate lawsuit regarding different legal claims, we see no reason that fact would affect the calculation of damages based on WVA's past breaches of the warranty of habitability in this case, much less call into "question[] the entire purpose of this appeal."

\*　　　\*　　　\*

Accordingly, for the reasons set forth above, we remand this case to the trial court to recalculate Mr. Woodley's damages and to award him at least $22,788.

*So ordered.*